******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MARQUIS JACKSON *v.* COMMISSIONER
OF CORRECTION
(AC 33343)

Bear, Keller and Harper, Js.

Argued December 2, 2013—officially released April 22, 2014

(Appeal from Superior Court, judicial district of Tolland, Schuman, J.)

*Peter Tsimbidaros*, for the appellant (petitioner).

*Rita M. Shair*, senior assistant state's attorney, with whom were *Michael Dearington*, state's attorney, and, on the brief, *Eugene R. Calistro*, *Jr.*, senior assistant state's attorney, and *Erika L. Brookman*, assistant state's attorney, for the appellee (respondent).

*Opinion*

BEAR, J. The petitioner, Marquis Jackson, appeals from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court erred in (1) denying his ineffective assistance of counsel claim; (2) denying his actual innocence claim and applying an incorrect legal standard in doing so; (3) denying his due process claim; and (4) refusing to accept his withdrawal of his petition without prejudice. We affirm the judgment of the habeas court.

The following facts, as set forth in the petitioner's direct appeal; *State* v. *Jackson*, 73 Conn. App. 338, 342–43, 808 A.2d 388, cert. denied, 262 Conn. 929, 814 A.2d 381 (2002); are relevant to our resolution of the present appeal. "On January 24, 1999, at approximately 3:30 a.m., [the petitioner] and [Vernon] Horn, along with Steven Brown, entered the Dixwell Deli on Dixwell Avenue in New Haven, wearing masks and carrying handguns. As Horn entered the deli, he fired five or six shots from a nine millimeter pistol. One bullet struck Caprice Hardy, a customer, and killed him. A second bullet struck Abby Yousif, an owner of the deli, in the shoulder. Brown and [the petitioner] followed Horn into the deli.

"[The petitioner] then went behind the counter and attempted to open the cash register. Horn and Brown went to the deli's back room where they found Vernon Butler, an off-duty employee, and Warren Henderson, a homeless man who helped out around the store. Butler was hit on his head with the butt of a gun, searched for money and taken to the front of the store by Horn to open the cash register. When Butler could not open the register, [the petitioner] took the cash that Yousif had in his pockets. Butler's cellular telephone was also stolen. The telephone was subsequently used the day after the robbery by Marcus Pearson, who had obtained it from Horn.

"During the course of the robbery, two customers, one of whom was Kendall Thompson, entered the deli. Upon entering, each individual was forced to the ground at gunpoint and ordered to turn over whatever money they possessed.

"In the back room, Brown riffled through Henderson's pockets, looking for any money that he may have had. Finding no money on Henderson's person, Brown searched the cigar boxes in the back room to see if there was any cash hidden there. After searching the back room, Brown returned to the front of the deli, where Horn was shouting orders by the door and [the petitioner] was still behind the counter near the cash register. Upon hearing the sound of sirens, [the petitioner], Horn and Brown fled the scene.

"The police processed the crime scene and found

latent fingerprints on a cigar box in the back room. The prints matched Brown's fingerprints on file with the Bridgeport police department. When interviewed by the New Haven police, Brown admitted his participation in the January 24, 1999 robbery and identified [the petitioner] and Horn as the other individuals involved.[1] [The petitioner] and Horn were arrested and tried jointly. [The petitioner] was found guilty of eight of the ten counts on which he was charged[2] and sentenced to a total effective sentence of forty-five years imprisonment." (Footnotes altered.)

The following procedural history is also relevant to our resolution of the present appeal. The petitioner filed a petition for a writ of habeas corpus as a self-represented litigant on July 21, 2005. He subsequently obtained an attorney and filed an amended petition on October 14, 2009. The following counts comprise the amended petition. Count one sets forth a claim of ineffective assistance by the petitioner's trial counsel, Michael Moscowitz. Count two sets forth a claim of trial court errors and omissions that violated the petitioner's constitutional rights to confront witnesses and present a defense. Count three sets forth a claim of violations of the petitioner's constitutional right to due process. Finally, count four sets forth a claim of actual innocence. The respondent, the Commissioner of Correction, filed an amended return on April 6, 2010. The petitioner filed a reply to the amended return on June 3, 2010.

The habeas court scheduled the trial for this matter to begin on January 25, 2011. On that date, both parties appeared before the habeas court, which asked the petitioner about "what purports to be a withdrawal" that it had received "on the eve of trial." The petitioner stated that he sought to withdraw his amended petition at that time because, inter alia, approximately two weeks before, his motion to consolidate his matter with Horn's habeas matter and his subsequent motion for a continuance had been denied.

The habeas court asked the petitioner if he intended to refile his amended petition at a later time and if his counsel had informed him of the potential consequences of withdrawal, including the inability to refile; the petitioner answered both questions in the affirmative. The habeas court then engaged in colloquies with counsel for both parties regarding their respective positions on the withdrawal; both counsel expressed that they did not know whether the court could accept the withdrawal only "with prejudice." The habeas court expressed its intent to label the withdrawal "with prejudice" because it viewed the withdrawal as an improper and untimely attempt to circumvent the denials of the petitioner's motions to consolidate and for a continuance. It stated to the petitioner that it either would accept his withdrawal only with prejudice or would

allow him to withdraw his withdrawal before the start of trial. The petitioner replied that he would withdraw the withdrawal.

The trial for this matter accordingly began on January 26, 2011, and continued on February 14, 15, 16, 17, 18, 24, and 25, 2011. In a memorandum of decision filed on March 22, 2011, the habeas court denied the amended petition. The habeas court held with respect to count one that Moscowitz had not rendered ineffective assistance of counsel. It held with respect to counts two and three that the petitioner had not briefed his claims therein and therefore had abandoned them. Finally, it held with respect to count four that the petitioner had not met his evidentiary burden and had not fulfilled the legal criteria for his actual innocence claim.

The petitioner subsequently filed a petition for certification to appeal the denial of his amended petition on March 30, 2011, which the habeas court granted on March 31, 2011. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

As a preliminary matter, we begin by addressing the petitioner's claims that the habeas court erred in denying his due process claim and refusing to accept his withdrawal of his amended petition without prejudice. The petitioner specifically argues with respect to his due process claim that he was entitled to a new trial because he presented evidence during the habeas trial that established the falsity of certain testimony upon which the jury in the criminal trial relied in finding him guilty. The petitioner specifically argues with respect to his withdrawal of his amended petition that the habeas court further violated his constitutional right to due process by stating that it would accept the withdrawal only "with prejudice," even though (1) our rules of practice do not provide a court with the authority to act in such a manner, and (2) the standard withdrawal form used in civil actions demonstrates the right of a plaintiff to withdraw an action without prejudice any time before the first witness is called at trial. We need not reach the merits of the petitioner's due process claim because, as did the habeas court, we treat the claim as abandoned in light of the petitioner's failure to brief it before the habeas court. Likewise, we need not reach the merits of the petitioner's claim regarding his withdrawal of his amended petition because we conclude that the petitioner has briefed the claim inadequately on appeal.

We note with respect to the petitioner's due process claim: "A reviewing court will not consider claims not raised in the habeas petition or decided by the habeas court. . . . Appellate review of claims not raised before the habeas court would amount to an ambuscade of the [habeas] judge." (Citations omitted; internal quo-

tation marks omitted.) *Henderson* v. *Commissioner of Correction*, 129 Conn. App. 188, 198, 19 A.3d 705, cert. denied, 303 Conn. 901, 31 A.3d 1177 (2011). In holding that it was unable to review one of the petitioner's claims on appeal, the court in *Henderson* noted: "In this case, we have reviewed the habeas petition, the pretrial briefs, the transcripts of the habeas trial and the posttrial briefs, and we can find no mention of [the] claim . . . . We also have thoroughly examined the habeas court's memorandum of decision and can find no mention of such a claim therein. Furthermore, during oral argument before this court, the petitioner's counsel stated that the habeas court had not ruled on this aspect of the claim and, in fact, that its memorandum of decision was silent on the issue. The habeas court could not and did not rule on the issue because it was not raised in the petition or tried before that court. On the basis of the foregoing, we are unable to review the petitioner's claim." (Internal quotation marks omitted.) Id.

We similarly are unable to review the petitioner's due process claim in the present matter. We carefully have reviewed the record, and we can find no mention of the petitioner's due process claim in the pretrial briefs, habeas trial transcripts, and posttrial briefs. As previously noted, the court treated the claim as abandoned: "[Count] . . . three of the amended petition appear[s] to allege . . . constitutional violations aside from ineffective assistance of counsel and actual innocence. The return makes a broad claim of procedural default and the reply suggests that there was cause and prejudice, but does not specifically mention that phrase. The petitioner did not brief [this claim]. On this incomplete state of the record, the court considers [this claim] abandoned." The petitioner argues in his reply brief that the amended petition sufficiently alleges his due process claim. He also directs our attention to the entirety of the habeas trial record and his pretrial and posttrial briefs, but without specifying relevant portions. We are not persuaded.

"It is not the responsibility of the trial judge, without some specific request from a petitioner, to search a record, often, in a habeas case, involving hundreds of pages of transcript, in order to find some basis for relief for a petitioner. . . . The responsibility of a habeas court, in confronting an often voluminous trial court record, is to respond to those claims fairly advanced by the petitioner. The mere recital of those claims in a petition, without supporting oral or written argument, does not adequately place those claims before the court for its consideration." (Citation omitted.) *Solek* v. *Commissioner of Correction*, 107 Conn. App. 473, 480–81, 946 A.2d 239, cert. denied, 289 Conn. 902, 957 A.2d 873 (2008). We accordingly conclude that we are unable to review the petitioner's due process claim because the habeas court did not err in treating the claim as

abandoned.

With respect to the petitioner's claim regarding his withdrawal of his amended petition, we note that "[r]eviewing courts are not required to review issues that have been improperly presented to th[e] court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without discussion or citation of authorities, it is deemed abandoned." (Internal quotation marks omitted.) *Richardson* v. *Commissioner of Correction*, 123 Conn. App. 301, 305–306, 1 A.3d 1142, cert. denied, 299 Conn. 910, 10 A.3d 528 (2010).

The petitioner's briefing of this claim consists of approximately one and one-half pages in which he (1) enumerates the habeas court's statements during the trial regarding the age of the matter, (2) mentions the rules of practice and the standard withdrawal form for civil actions in passing, and (3) summarily asserts that the habeas court violated his constitutional right to due process. He does not cite to any relevant case or statute,[3] and he does not provide any legal analysis in support of his claim. We thus deem the petitioner's claim with respect to his withdrawal to be abandoned on appeal.

II

We next consider the petitioner's ineffective assistance of counsel claim and begin our analysis with the well established standard of review for such claims. "A petitioner's right to the effective assistance of counsel is guaranteed by the sixth and fourteenth amendments to the United States constitution, and by article first, § 8, of the Connecticut constitution." *Woods* v. *Commissioner of Correction*, 85 Conn. App. 544, 549, 857 A.2d 986, cert. denied, 272 Conn. 903, 863 A.2d 696 (2004). "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given their testimony. . . .

"In *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the United States Supreme Court enunciated the two requirements that must be met before a petitioner is entitled to reversal of a conviction due to ineffective assistance of counsel. First, the [petitioner] must show that counsel's performance was deficient. . . . Second, the [petitioner] must show that the deficient performance prejudiced

the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversarial process that renders the result unreliable. . . .

"The first component, generally referred to as the performance prong, requires that the petitioner show that counsel's representation fell below an objective standard of reasonableness. . . . In *Strickland*, the United States Supreme Court held that [j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proven unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged counsel, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. . . .

"[T]he Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim. . . . The [petitioner] is also not guaranteed assistance of an attorney who will make no mistakes. . . . What constitutes effective assistance [of counsel] is not and cannot be fixed with yardstick precision, but varies according to the unique circumstances of each representation." (Citations omitted; internal quotation marks omitted.) *Henderson* v. *Commissioner of Correction*, 80 Conn. App. 499, 503–505, 835 A.2d 1036 (2003), cert. denied, 267 Conn. 918, 841 A.2d 1190 (2004).

A

The petitioner claims that the habeas court erred in concluding that Moscowitz did not render ineffective assistance of counsel during the petitioner's criminal trial for three reasons. The first reason is that Moscowitz moved to strike potentially exculpatory evidence on the ground that it necessarily was accompanied by evidence that he deemed prejudicial, even though the trial court provided him with an opportunity to investigate the purportedly prejudicial evidence. We are not persuaded.

The following additional facts and procedural history

are relevant. "[Shaquan] Pallet testified at the [criminal] trial that he worked with the victim on the morning of the murder. After work, Pallet and the victim shared a taxicab. The taxicab initially went to the Dixwell Deli, where the victim was dropped off shortly before 3:30 a.m. to purchase some cigarettes. Outside the deli, Pallet testified that he saw [the petitioner] and Horn smoking 'wet.'[4] After receiving a cigarette from Hardy, Pallet left in the taxicab. Hardy remained at the deli." *State* v. *Jackson*, supra, 73 Conn. App. 377.

"During direct examination by the state, Pallet was shown a letter that he had written. When offered as a full exhibit by the state, neither defense attorney objected. The state then proceeded to read the contents of the letter into evidence. In the letter, Pallet recanted the testimony that he gave at the probable cause hearing identifying [the petitioner] as one of the three individuals he had seen at the deli immediately prior to the murder and robbery. Rather, the letter stated that Pallet had not seen [the petitioner] at the scene and had testified to that effect only because 'a lot of people told that [the petitioner] was one of the guys that had something to do with my friend, Caprice Hardy, being murdered.'[5] Pallet testified that he wrote the letter while he was in jail after somebody slipped a note under his cell door telling him to write it. Whereupon [Moscowitz] objected and asked for the jury to be excused.

"Outside the presence of the jury, [Moscowitz] argued that Pallet's letter should not have been admitted into evidence . . . . [Moscowitz] suggested that the proper remedy would be for the [trial] court to strike the state's reading of the Pallet letter from evidence and give a curative instruction to the jury to disregard it. The [trial] court ruled in [the petitioner]'s favor and instructed the jury that '[t]he [letter] . . . that was read to you just before the recess that Mr. Pallet gave testimony about and why he wrote it and the contents of that [letter], I'm striking from this case and you should not—disregard it and do not pay any attention to it whatsoever during your deliberations in this matter.' " Id., 383–84.

The habeas court found with respect to Moscowitz' decision-making process: "Moscowitz asked the [trial] court on two occasions to strike the portion of the testimony concerning the note. The [trial] court declined to do so, remarking that it would have sustained an objection to the note without proof that it came from one of the defendants, but the letter had come in without objection, giving the state the right to put the letter into context and show the circumstances. . . .

"There was also a discussion concerning the origins of the note. The state claimed it had no knowledge of its origins. Pallet testified he received the note while detained at the Whalley Avenue jail [in New Haven] and then gave the note to a female counselor. Moscowitz

suggested that it was unclear whether the petitioner was housed in the same jail as Pallet. Moscowitz then asked for some time to investigate, which the court granted with the suggestion that he issue a subpoena to the Department of Correction. . . .

"Although Moscowitz initially complained about the difficulty of issuing subpoenas in his role as a special public defender, the court took a recess and Moscowitz began to proceed to an office from which he could issue a subpoena. Apparently on the way, Moscowitz had a change of heart and decided to move to strike the entire line of testimony concerning the letter and the note. Moscowitz and the other counsel also met with the [trial] court in a chambers conference. . . . On the record, Moscowitz noted that 'my client is adamant against what I'm saying, but I'm not quite sure whether the court is leaving the choice up to my client or myself.' Moscowitz then reiterated that he wanted the entire testimony stricken, and '[i]f [the petitioner] wants to take action against me at a later date, he can.' " (Citations omitted.)

During the habeas trial, Moscowitz testified that he would have liked to have kept the letter alone in evidence, but he ultimately concluded that evidence of both the letter and the note would have been prejudicial to the petitioner's criminal case. He elaborated that he thought that the documents would have been inextricably intertwined in the minds of the jurors, who could have drawn adverse inferences against the petitioner from the note, the unanswered question of its author, and the way in which it prompted Pallet to write the letter. Moscowitz further testified that he would have reached the same conclusion if he had investigated the note in accordance with the trial court's directive because his concern about prejudice arose from Pallet's testimony regarding the note, not the existence or nonexistence of the note itself.

The habeas court labeled Moscowitz' decision not to investigate the note as "remiss" but nonetheless held: "[T]he only evidence at the habeas trial of what further investigation would have revealed was a stipulation that both the petitioner and Horn were housed at the McDougall-Walker Correctional Center [in Suffield] on September 24, 1999, when Pallet was detained at the Whalley Avenue jail. . . . Although it is true that this evidence makes it less likely that the petitioner (or Horn) could have supplied the note to Pallet, Moscowitz correctly observed in his testimony that the petitioner and Horn were nevertheless the two people with the strongest motive to influence Pallet. Thus, Moscowitz sensibly was concerned that, regardless of what an investigation revealed regarding who wrote the note, the jury would still draw a negative inference against his client. Moscowitz also sensed that, if he attacked Pallet for lying about the existence of the note, that the

jury might also find Pallet to be lying about the letter of recantation, thus defeating the purpose. Hence, regardless of what an investigation might show, allowing in testimony about the note was an option fraught with peril.

"Against this prejudicial effect must be weighed the probative value of the letter of recantation. There is no denying that Pallet's recantation went to the heart of the state's case. But a recantation is viewed with skepticism by the law and, presumably, by a jury. . . . Further, this recantation did not come in the form of live testimony by the witness, but rather consisted of a prior, out-of-court statement. It did not come unblemished, but rather attached to testimony that someone had pressured the writer into making it. All these considerations reduced the letter's probative value.

"In short, Moscowitz made a reasonable evaluation of the costs and benefits of admitting the letter. It is clear, from the fact that Moscowitz had no objection to the admission of the letter by itself, that Moscowitz understood the possible benefits of admission. But he also understood that the letter was a two-edged sword, and that the other edge could hurt his case. Moscowitz opted for a careful approach." (Citation omitted; footnote omitted.)

We agree. "We reiterate that in deciding a claim of ineffective assistance of trial counsel, the reviewing court does not grade counsel's conduct . . . nor does the court determine which of numerous strategies counsel should have used at trial. Rather, the court's inquiry is limited to determining whether the challenged conduct from the perspective of counsel at that time was deficient." (Citation omitted.) *Holley* v. *Commissioner of Correction*, 62 Conn. App. 170, 176, 774 A.2d 148 (2001). Moscowitz' habeas trial testimony demonstrates that he exercised reasonable professional judgment by engaging in a probative versus prejudicial weighing of the evidence and seeking to minimize its impact on the jury by moving to strike it in timely fashion, once he had determined that it would be more prejudicial than probative. Whether he would have obtained a more favorable result if he had taken another course of action is not a question within the scope of our inquiry, which we limit to the course of action that he did take.

The petitioner argues that Moscowitz' conduct was deficient because (1) an investigation would have led to the discovery that "there was no note"; (emphasis omitted); which would have allowed Moscowitz to have the letter in evidence without the taint of the note; and (2) the jury would have found the letter to be credible. The petitioner does not provide evidentiary support or relevant legal authority for his position. We decline to second-guess Moscowitz' decision, which was based on clearly articulated strategic reasoning and made in the midst of trial, when the deficiency claimed by the peti-

tioner is tethered to prognostication and speculation. See *Brown* v. *Commissioner of Correction*, 131 Conn. App. 497, 507, 27 A.3d 33 ("[w]e decline to second-guess [trial counsel]'s decision not to present the evidence at issue when there is no evidentiary or logical basis upon which to conclude that the decision not to present the evidence caused any prejudice to the petitioner"), cert. denied, 303 Conn. 905, 31 A.3d 1181 (2011). We therefore hold that the habeas court did not err in rejecting the petitioner's argument that Moscowitz' conduct regarding the letter and the note constituted deficient performance.

B

The second reason that the petitioner claims ineffective assistance of counsel is that Moscowitz failed to investigate and call several witnesses whose testimony would have supported the petitioner's alibi defense. More specifically, the petitioner claims that Moscowitz would have been able to establish a credible uninterrupted time line accounting for the petitioner's whereabouts at all relevant times if he had investigated and called Mildred Spann, Shamar Madden, Kenneth Ransome, Derek Gilliam, and Cheryl Dennis to testify at the criminal trial. We are not persuaded.

We first note the following additional relevant facts, which the habeas court cited and this court outlined in its decision on the petitioner's direct appeal: "[The petitioner] testified that on the night of the robbery, he was at the Alley Cat Club [in New Haven] until it closed at around 2 a.m. Upon leaving the club, [the petitioner] stated that he and Horn drove through a diner parking lot but did not eat there. [The petitioner] and Horn then drove to the West Hills section of New Haven and picked up [Zanetta] Berryman. The three went to the Dixwell Deli, where [the petitioner] went inside to get change for a dollar to make a telephone call to his girlfriend. . . . [The petitioner] . . . testified that he did not see Horn go into the deli, nor did he enter the store with Horn, but he assumed that Horn went into the deli. After [the petitioner] attempted to make the call on a nearby pay telephone, he returned to the car and the three drove to [the petitioner]'s residence where Horn and Berryman exited the vehicle and [the petitioner] drove to his mother's house." *State* v. *Jackson*, supra, 73 Conn. App. 370–71. Berryman testified at the criminal trial, and her version of the relevant events corroborated the petitioner's version. Id., 369–70.

"The state called [Detective Petisia] Adger as a rebuttal witness in [the petitioner]'s case. Adger testified that when she interviewed [the petitioner], [the petitioner] stated that he and Horn ate at the diner and were at the Dixwell Deli at 3:30 a.m., the time the crimes occurred, and [the petitioner] did not get to his mother's house until after 4 a.m." Id., 371. The habeas court found that, despite the petitioner's admission, Moscow-

itz presented two alibi witnesses: (1) the petitioner's then girlfriend, Lateisha Smith, who testified that she met with the petitioner at the Alley Cat Club at 2 a.m., saw him again when he came to her residence at 3 a.m. and stayed until late morning; and (2) Smith's sister, Adrienne Debarros, who testified that she saw the petitioner and Horn leave the Alley Cat Club between approximately 1:45 and 2 a.m.

The petitioner now claims that Moscowitz provided ineffective assistance of counsel because the alibi witnesses whom he investigated and called to testify were not credible and could not support a complete alibi defense, unlike Spann, Madden, Ransome, Gilliam, and Dennis. Spann testified at the habeas trial that she is married to one of the owners of 235 West Ivy Street in New Haven, where the petitioner rented a room at the time of the incident. On the evening of January 23, 1999, after 11 p.m., Spann went to 235 West Ivy Street to collect the petitioner's rent money, and the two of them discussed his plans for the evening, which were to go to the Alley Cat Club. Spann recalled that the petitioner drove a silver Honda.

Madden and Ransome both testified that they were regulars at the Alley Cat Club and were there during the late evening hours of January 23, 1999, and early morning hours of January 24, 1999. Inside the club, both Madden and Ransome saw the petitioner; both men had known the petitioner for many years. Madden also saw Horn. Both Madden and Ransome then saw the petitioner and Horn outside the club after it closed at approximately 2 a.m. Madden testified that the patrons of the club normally congregated in front of the club for approximately twenty minutes after it closed.

Ransome testified that he went to the Athenian Diner in New Haven between approximately 2:15 a.m. and 2:30 a.m. because "everybody [went] to the diner after the club." He saw the petitioner in the parking lot of the diner before 2:30 a.m., sitting in a Honda with another individual. Ransome did not see the petitioner again that evening.

Gilliam testified that he was at a birthday party being held in his honor at 13 South Genesee Street in New Haven on the night of January 23, 1999. The party lasted from 8 or 9 p.m. to 2 or 3 a.m. At approximately 2 or 3 a.m., Gilliam was inside 13 South Genesee Street and observed his girlfriend, Quata Miller, her cousin, Cheryl Dennis, and Berryman, Dennis' sister-in-law, standing outside and smoking cigarettes for ten to fifteen minutes. A car pulled up to them; Gilliam could not see any of its occupants. Berryman approached the car and entered it after a door was opened for her. Dennis testified that Berryman had a "friendly" conversation with one of the car's occupants before getting into the car and leaving. She also testified that she recalled telling an investigator in May, 2005, that she had seen

a small, gray car with two occupants, one of whom conversed with Berryman for fifteen minutes.

The petitioner argues that he would have had a complete alibi defense if Moscowitz had investigated and called these individuals to testify because their testimony would have provided a factual basis for the jury to find that he was not with Brown at all relevant times, as Brown testified during the criminal trial that the petitioner and Horn took him to New Haven after meeting with him in Bridgeport at an unspecified time on the evening of January 23, 1999. Moscowitz thought otherwise and testified during the habeas trial: "[A]libi defenses have never really worked for me, and I'm not very confident of alibi defenses and this was a case of an alibi defense and the time lines, there was a problem with them." When asked if he had discussed his position with the petitioner, Moscowitz answered that the petitioner "knew there was a problem with the time frame." Moscowitz specified: "The times overlapped. . . . One witness who was indicating a time when he should have been with another witness or—the times weren't correct." The habeas court held that Moscowitz did not provide ineffective assistance of counsel by failing to investigate and call Spann, Madden, Ransome, Gilliam, and Dennis to testify because, inter alia, they "would not have taken the time line any further into the early morning hours," and they "did not provide an alibi for the petitioner for the precise time when the crime occurred."

We agree. "In consideration of [a] petitioner's claim concerning the adequacy of trial counsel's investigation and the calling of alibi witnesses, [t]he petitioner seeks to have us use hindsight with [regard] to his counsel's decision not to call the witnesses to testify. We will not do so. We have stated that the presentation of testimonial evidence is a matter of trial strategy. . . . The failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense." (Internal quotation marks omitted.) *Hopkins* v. *Commissioner of Correction*, 95 Conn. App. 670, 676, 899 A.2d 632, cert. denied, 279 Conn. 911, 902 A.2d 1071 (2006).

The petitioner has not shown how the testimony at issue would have been helpful in establishing a complete alibi defense. None of the testimony accounts for his whereabouts between approximately 3 and 4 a.m. on January 24, 1999, i.e., immediately before, during, and after the robbery. Also, when asked by this court during oral argument about this temporal gap in his alibi defense, the petitioner's counsel directed our attention not to any of the testimony at issue but rather to Berryman's criminal trial testimony, which proved to be unpersuasive to the jury. The habeas court found

that the evidence offered by the petitioner at the habeas trial in support of his alibi defense contained omissions for the crucial time period, and, therefore, the habeas court did not err in concluding that it was insufficient to establish that defense. We thus hold that the habeas court did not err in rejecting the petitioner's argument that Moscowitz' failure to investigate and call Spann, Madden, Ransome, Gilliam, and Dennis to testify at the criminal trial constituted deficient performance.

C

The final reason that the petitioner claims ineffective assistance of counsel is that Moscowitz failed to present evidence of third party culpability, even though he and the petitioner had identified certain individuals who were more closely associated with Brown than was the petitioner and who more closely matched the physical descriptions of the two other suspects than did the petitioner. We are not persuaded.

The individuals identified as potentially culpable third parties were Marlo Macklin, Brown's brother-in-law; Willie Sadler, Macklin's cousin; and Willie Newkirk, Sadler's friend. The petitioner elicited testimony from Brown during the habeas trial regarding Brown's acquaintance with Macklin, Sadler, and Newkirk through the Bridgeport drug trade at all times relevant to the present matter. He was unable, however, to produce Macklin, Sadler, or Newkirk to testify and instead relied upon statements made by Sadler and Newkirk to investigator Gerald O'Donnell, which the habeas court admitted over the respondent's hearsay objection, under the residual exception. During closing argument, the petitioner contended that Moscowitz should have introduced evidence during the criminal trial to support a third party culpability defense, given (1) Brown's history of violent criminal activity with Macklin, Sadler, and Newkirk and (2) the fact that Macklin's, Sadler's, and Newkirk's heights and weights at the time of the robbery closely matched those estimated for the two men who committed the robbery with Brown.

The habeas court found that Moscowitz asked Brown during direct and cross-examination if Sadler had been with Brown at the time of the crime and if Brown knew whether Macklin was a suspect. The trial court sustained the state's objections to these questions, and Moscowitz did not ask any further such questions. Moscowitz testified during the habeas trial that he did not pursue a third party culpability defense because he was aware of the high standard for introducing evidence under its auspices, and "[t]here wasn't enough connection. Mere suspicion of a third party is not enough . . . ." When asked if he had tried to pursue a third party culpability defense, he answered: "I did, but it was objected to. And I really didn't have a lot . . . to do to show a third party because in this case, if I remember, there was . . . at least two people . . .

that are testifying that Horn and [the petitioner] did it."

The habeas court held: "Given these facts, Moscowitz did not render deficient performance. There is no showing that Moscowitz could even have produced Sadler, Newkirk, and Macklin for the criminal trial, a point emphasized by the petitioner's inability to produce them at the habeas trial. Even their out-of-court statements do not directly connect them to the crime. None of them admitted any involvement in the robbery. There is no physical evidence linking them to the scene. No witness identified any of them as being at the deli on January 24. The fact that they engaged in drug activities with Brown, or may have had similar height and weight to some of the suspects, does not significantly tie them to the scene."

We agree. "We have recognized consistently that a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been charged. . . . The defendant must, however, present evidence that *directly connects* a third party to the crime . . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused. . . . [I]n explaining the requirement that the proffered evidence establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party, we have stated [that] [s]uch evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of third party culpability [introduced by the defendant] in an attempt to divert from himself the evidence of guilt." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 634–35, 1 A.3d 1051 (2010). "It is not ineffective assistance of counsel . . . to decline to pursue a third party culpability defense when there is insufficient evidence to support that defense." *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 515, 964 A.2d 1186 (citing cases), cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009).

Despite the petitioner's assertions that he could prove Macklin's, Sadler's, and Newkirk's "direct connection" to the robbery by virtue of their supposed physical resemblance to the two men who committed the robbery with Brown, "a defendant proposing such third party culpability evidence must demonstrate that the evidence is corroborative rather than merely coincidental for it to be admissible." *State* v. *Corley*, 106 Conn. App. 682, 689, 943 A.2d 501, cert. denied, 287 Conn. 909, 950 A.2d 1285 (2008). The petitioner relies upon the physical characteristics of Macklin, Sadler, and Newkirk as proof of their connection to the robbery. The petitioner also emphasizes the significance of the criminal history shared by Brown, Macklin, Sadler, and

Newkirk. Without more evidence, each of these assertions, even if proved, remains coincidental rather than corroborative. Our Supreme Court held in *Hedge* that evidence of a third party's prior bad acts is admissible under the auspices of a third party culpability defense; *State* v. *Hedge*, supra, 297 Conn. 653; but it did so where the defendant was charged with drug related crimes, and the evidence "placed [the third party, who previously had been convicted of drug related crimes] at the scene of the crime . . . within twenty-four hours of the defendant's arrest and in possession of drugs." Id., 636. The petitioner here has not directed our attention to any evidence that would place Macklin, Sadler, or Newkirk at the deli before, during, or after the robbery or that would put them in possession of anything that would directly connect them to the robbery.[6]

We cannot conclude that Moscowitz rendered ineffective assistance of counsel for deciding not to pursue a third party culpability defense where we have determined that there was insufficient evidence available to him that would have supported the defense in the context of the petitioner's case. We therefore hold that the habeas court did not err in rejecting the petitioner's argument that Moscowitz' conduct regarding the petitioner's third party culpability defense constituted deficient performance.

### III

Lastly, the petitioner claims that the habeas court erred in denying his actual innocence claim because (1) it "applied the wrong standard to the claim" when it stated in its memorandum of decision that it could "only go so far as to say that it ha[d] a reasonable doubt about the petitioner's guilt," and (2) the evidence that he presented at his criminal and habeas trials was sufficient to discredit the time line of relevant events provided by Brown, relied upon by the state, and credited by the jury at the criminal trial. We are not persuaded.

"Actual innocence, also referred to as factual innocence . . . is different than legal innocence. Actual innocence is not demonstrated merely by showing that there was insufficient evidence to prove guilt beyond a reasonable doubt. . . . Rather, actual innocence is demonstrated by affirmative proof that the petitioner did not commit the crime." (Citations omitted.) *Gould* v. *Commissioner of Correction*, 301 Conn. 544, 560–61, 22 A.3d 1196 (2011).

"[T]he proper standard for evaluating a freestanding claim of actual innocence . . . is twofold. First, the petitioner must establish by clear and convincing evidence that, taking into account all of the evidence—both the evidence adduced at the original criminal trial and the evidence adduced at the habeas corpus trial—he is actually innocent of the crime of which he stands convicted. Second, the petitioner must also establish

that, after considering all of that evidence and the inferences drawn therefrom as the habeas court did, no reasonable fact finder would find the petitioner guilty of the crime. . . .

"Our Supreme Court recently clarified the actual innocence standard in *Gould* . . . . In *Gould*, the habeas court found that the petitioner was entitled to relief on his actual innocence claim after the recantations of testimony that was the sole evidence of [the petitioner's] guilt. . . . On appeal, our Supreme Court held that the clear and convincing burden . . . requires more than casting doubt on evidence presented at trial and the burden requires the petitioner to demonstrate actual innocence through affirmative evidence that the petitioner did not commit the crime. . . . Recantations of inculpatory criminal trial testimony undoubtedly are relevant to a determination of actual innocence. But evidence of that nature must be accompanied by *affirmative* evidence of innocence to meet [the] standard of clear and convincing evidence of actual innocence." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Harris* v. *Commissioner of Correction*, 134 Conn. App. 44, 49–50, 37 A.3d 802, cert. denied, 304 Conn. 919, 41 A.3d 306 (2012).

"Affirmative proof of actual innocence is that which might tend to establish that the petitioner *could not* have committed the crime even though it is unknown who committed the crime, that a *third party* committed the crime or that *no* crime actually occurred. . . . Clear and convincing proof of actual innocence does not, however, require the petitioner to establish that his or her guilt is a factual impossibility." (Citations omitted; emphasis in original.) *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 563–64.

"With respect to the first component of the petitioner's burden, namely, the factual finding of actual innocence by clear and convincing evidence . . . [t]he appropriate scope of review is whether, after an independent and scrupulous examination of the entire record, we are convinced that the finding of the habeas court that the petitioner is actually innocent is supported by substantial evidence. This is the same scope of review that we apply to the ultimate finding by a trial court regarding whether a confession in a criminal case is voluntary. . . . The weight of the interests at stake in the factual determination by the habeas court in the present case compels the same heightened level of scrutiny." (Internal quotation marks omitted.) *Harris* v. *Commissioner of Correction*, supra, 134 Conn. App. 51.

"[O]ur Supreme Court has deemed the issue of whether a habeas petitioner must support his claim of actual innocence with newly discovered evidence an open question in our habeas jurisprudence. . . . This court, nevertheless, has held that a claim of actual inno-

cence must be based on newly discovered evidence. . . . [A] writ of habeas corpus cannot issue unless the petitioner first demonstrates that the evidence put forth in support of his claim of actual innocence is newly discovered. . . . This evidentiary burden is satisfied if a petitioner can demonstrate, by a preponderance of the evidence, that the proffered evidence could not have been discovered prior to the petitioner's criminal trial by the exercise of due diligence." (Citation omitted; internal quotation marks omitted.) *Gaston* v. *Commissioner of Correction*, 125 Conn. App. 553, 558–59, 9 A.3d 397 (2010), cert. denied, 300 Conn. 908, 12 A.3d 1003 (2011).

The habeas court found that the newly discovered evidence offered by the petitioner in support of his actual innocence claim consisted of two recantations. "The first is an additional recantation from [Pallet]. In this version, Pallet was detained in a New Haven jail cell with Eaker Stancil in May or June, 1999, when Pallet apparently either saw Horn or the petitioner. Pallet became scared and nervous. Soon thereafter he informed Stancil that, although he told the police that he saw Horn and the petitioner at the deli at the time of the crime, his statement to the police was not true. He added that he lied to 'dig himself out of [a] hole' because he himself was arrested for other robberies in March, 1999." Pallet did not testify at the habeas trial; the petitioner introduced the recantation into evidence through the testimony of Stancil, which the habeas court admitted over the respondent's hearsay objection as a statement against penal interest.

"The second recantation came from Marcus Pearson. Pearson testified at the habeas trial that Horn did not provide him a cell phone, nor did he use a cell phone, to call Crystal Sykes on January 25 at 11:07 a.m. He added that he lied at the criminal trial out of fear, particularly that, if he did not cooperate, the state would violate his probation for sale of controlled substances, take custody of his children, or implicate him in the Dixwell Deli murder."

The habeas court found Pallet's recantation to be not credible and Pearson's recantation to be questionable. It also determined: "Ultimately, even if the court were to discredit the state's theory that Horn was in possession of the stolen cell phone, it could not conclude that the petitioner is actually innocent. In particular, the petitioner has not met the first part of the actual innocence test . . . . It is true that there was no physical evidence directly linking the petitioner to the crime, especially when one discounts Pearson's original testimony about the phone call. The state instead premised its case on identification evidence. Although very little of that evidence is indisputable, most of that evidence is at least incriminating." (Citation omitted.)

The habeas court elaborated: "Brown, while very

vague on details twelve years after the crime, remains resolute that he committed the crime with the petitioner and Horn. [Pallet] recanted twice while in jail before his testimony, but in his actual testimony under oath he was absolutely certain that he saw the petitioner, Horn and an unidentified third person outside the deli at the time of the crime. [Thompson], a customer who walked into the deli at the time of the robbery, made an out-of-court identification of the petitioner and Horn as the gunmen whom he saw, though he backed off that identification at trial. . . . Regina Wolfinger, another [customer] who had been using drugs that night, identified a photo of Horn with 75 percent certainty as the person whom she saw standing outside the deli and then leaving just after the robbery. . . . Butler, an employee and a victim, testified that Horn knew about the back room of the store from prior visits there. . . . The petitioner himself admitted to the police that he had been at the deli around 3:30 a.m. that night.

"Thus, while few things were clear and convincing in this complicated case, there remains a significant amount of evidence pointing to the petitioner's guilt. While the state's case was not overwhelming, it was clearly sufficient. While Pearson has now recanted, he was far from the sole witness against the petitioner. . . . With Pearson's recantation and the other evidence presented by the petitioner, the court can only go so far as to say that it has a reasonable doubt about the petitioner's guilt. But that finding falls short of holding that the petitioner has proven his innocence by clear and convincing evidence." (Citations omitted.)

The petitioner cites to the habeas court's "reasonable doubt" statement in arguing that the habeas court erred by applying the wrong standard of law to his actual innocence claim. He specifies: "In order for this court to affirm that [the petitioner's conviction was] reliable, this court must believe the time line espoused by the state through [Brown]." The habeas court, however, cited and applied the same standards of law that this court now cites and applies. The petitioner has not cited to any authority for his position, which appears to modify his well established burden of proof with an unsupported burden of belief upon this court. This court therefore rejects the petitioner's argument regarding the correctness of the law applied by the habeas court.

We also reject the petitioner's argument that the habeas court erred in denying his actual innocence claim because the habeas court's conclusion is consistent with our Supreme Court's holding in *Gould* that recantations like those presently at issue do not by themselves satisfy the evidentiary requirements for actual innocence claims. The petitioner repeatedly contends that these recantations, combined with the totality of the evidence at the criminal and habeas trials, establish that "the time line espoused by the state

through [Brown] . . . [was] factually impossible," and that "it [was] impossible for [him] to have been in Bridgeport with Brown and later to have been with [Brown] again at the Dixwell Deli to commit the crime." The petitioner's position relies in large part upon a determination by this court that the habeas court clearly erred in deeming Pallet's recantation to be not credible and Pearson's recantation to be questionable. We decline to make this determination.

"As an appellate court, we do not reevaluate the credibility of testimony, nor will we do so in this case. The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given their testimony. . . . In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous . . . . This court does not retry the case or evaluate the credibility of witnesses. Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Citation omitted; internal quotation marks omitted.) *Corbett* v. *Commissioner of Correction*, 133 Conn. App. 310, 316–17, 34 A.3d 1046 (2012) (affirming habeas court's denial of petitioner's actual innocence claim where petitioner relied in part on testimony deemed not credible).

The habeas court did not clearly err in discrediting Pallet's May or June, 1999 recantation on the ground that it was hearsay admitted under the statement against penal interest exception and a recanted recantation, as Pallet testified during the criminal trial in April, 2000, that he was "absolutely certain" of his initial identification of the petitioner and Horn. The habeas court also did not clearly err in questioning the credibility of Pearson's recantation on the ground that Pearson testified to his friendship with Horn, and Pearson's probation officer testified that she did not make the threats to which Pearson testified.

Even if we were to determine otherwise and accept the petitioner's characterization of the recantation evidence, which we do not, the effect of the evidence at best would be only to demonstrate that there is a lack of "credible evidence that the [petitioner] did commit the crimes of which [he was] convicted," not to "prove by clear and convincing evidence that the [petitioner] did *not* commit the crimes." (Emphasis in original.) *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 566–67. Neither recantation bears upon the additional identification evidence enumerated by the habeas court as a sufficient factual basis for the jury to have found the petitioner guilty. Pallet's recantation would affect the viability of only his identification, not the other identifications of the petitioner and Horn. Pearson's recantation similarly would cast a dubious light upon the evidentiary value only of the cell phone, not the iden-

tifications.

Furthermore, neither recantation "establish[es] that the petitioner *could not* have committed the crime even though it is unknown who committed the crime, that a *third party* committed the crime or that *no crime* actually occurred." (Emphasis in original.) Id., 563; see also *Gaston* v. *Commissioner of Correction*, supra, 125 Conn. App. 560–61 (petitioner could not establish actual innocence claim by clear and convincing evidence when there was independent evidence that was sufficient to support his conviction). Both recantations fail to prove clearly and convincingly, either independently or in concert with the evidence at the criminal and habeas trials, that the petitioner could not have participated in the robbery, either because he could not have been present at the Dixwell Deli during the robbery or because he could not have been one of the two men who committed the robbery with Brown. The petitioner directs our attention to certain evidence from his criminal and habeas trials in order to meet the "affirmative evidence" requirement of his actual innocence claim. At no point during the habeas trial or the present appeal, however, has the petitioner argued or demonstrated by a preponderance of the evidence that such evidence qualifies as "newly discovered evidence."[7]

We agree with the habeas court that "there was no physical evidence directly linking the petitioner to the crime"; that "few things were clear and convincing in this complicated case"; and that the state's case was "sufficient" but "not overwhelming . . . ." Nonetheless, in the words of the court in *Gould*, "[i]t must be remembered . . . that, once properly convicted, the [petitioner] no longer [is] cloaked in the mantle of the presumption of innocence. . . . Discrediting the evidence on which the conviction rested does not revive the *presumption* of innocence. To disturb a long settled and properly obtained judgment of conviction, and thus put the state to the task of reproving its case many years later, the [petitioner] must affirmatively demonstrate that [he is] *in fact* innocent." (Citation omitted; emphasis in original.) *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 567.

We conclude for the foregoing reasons and after an independent and scrupulous examination of the entire record that the habeas court did not err in denying the petitioner's actual innocence claim because the petitioner did not meet the first prong of his burden, to prove his actual innocence clearly and convincingly with affirmative, newly discovered evidence. We therefore need not address the second prong of the petitioner's burden, which is to prove that no reasonable fact finder would find him guilty in light of the evidence before both the criminal and habeas courts.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] "Steven Brown pleaded guilty and testified as a witness for the state." *State* v. *Jackson*, supra, 73 Conn. App. 342 n.5.

[2] Specifically, the petitioner was convicted of "one count of felony murder in violation of General Statutes § 53a-54c, three counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), two counts of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a) (2), one count of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2) and one count of carrying a pistol without a permit in violation of General Statutes § 29-35 (a)." *State* v. *Jackson*, supra, 73 Conn. App. 340–41.

[3] In a case decided earlier this year, moreover, we held that "[t]he disposition of withdrawal with prejudice exists within Connecticut jurisprudence." *Mozell* v. *Commissioner of Correction*, 147 Conn. App. 748, 757, 83 A.3d 1174, cert. denied, 311 Conn. 928,      A.3d      (2014).

[4] " '[W]et' . . . is marijuana that has been dipped in embalming fluid." *State* v. *Bowman*, 289 Conn. 809, 812, 960 A.2d 1027 (2008).

[5] The letter, dated September 24, 1999, read in its entirety: "I'm writing this concerning the Marquis Jackson case. I gave a statement to the police concerning that case. I gave some false information in that statement. I said I saw Marquis Jackson at the scene where my friend Caprice Hardy was murdered. I'm deeply sorry but, that is untrue the only reason I said that I saw Marquis Jackson at the scene, was because a lot of people told that he was one of the guys that had something to do with my friend Caprice Hardy being murdered. Truth is, I didn't see anybody that I recognize that night. Shaquan Pallet."

[6] To the extent that the petitioner would argue that Butler's stolen cell phone directly connects Macklin, Sadler, or Newkirk to the robbery because they may have made or received calls on it, we are not persuaded for the reasons set forth in part III of this opinion.

[7] The petitioner makes much of what he characterizes as a recantation by Brown regarding the finding at the criminal trial that Horn stole Butler's cell phone during the robbery and lent it to Pearson. Specifically, the petitioner argues that "Brown recanted at the habeas trial, admitting that he had the cell phone in his possession at all times . . . ." The petitioner misinterprets the testimony upon which he relies. The petitioner asked Brown on multiple occasions if he testified during the criminal trial "that if there [was] a phone call *made to Bridgeport* [on Butler's cell phone during the morning and early afternoon of January 24, 1999], [he] made it"; Brown answered in the affirmative. (Emphasis added.) The 11:07 a.m. call attributed to Pearson, however, was made to a number in West Haven. Given this fact, and that Brown expressly confirmed his criminal trial testimony during his habeas trial testimony, we are unable to conclude that Brown "recanted" in the manner set forth by the petitioner.