******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

TROY WESTBERRY *v.* COMMISSIONER
OF CORRECTION
(AC 37709)

DiPentima, C. J., and Alvord and Gruendel, Js.

*Argued October 13—officially released December 20, 2016*

(Appeal from Superior Court, judicial district of
Hartford, Schuman, J.)

*Naomi Fetterman*, with whom, on the brief, was
*Aaron J. Romano*, for the appellant (petitioner).

*Ronald G. Weller*, senior assistant state's attorney,
with whom, on the brief, were *Gail P. Hardy*, state's
attorney, and *Jo Anne Sulik*, supervisory assistant
state's attorney, for the appellee (respondent).

*Opinion*

ALVORD, J. The petitioner, Troy Westberry, appeals from the judgment of the habeas court denying his second petition for a writ of habeas corpus.[1] On appeal, the petitioner claims that the habeas court erred by rejecting his claim that perjured testimony was used at his criminal trial, in violation of the fourteenth amendment to the federal constitution, and that he is actually innocent. We disagree and, accordingly, affirm the judgment of the habeas court.

At trial, the jury reasonably could have found the following facts. The events giving rise to the petitioner's conviction were the culmination of a period of animosity between a group of individuals that included the petitioner and Jesse Pope and another group of individuals that included Gerald Jenkins, Dwayne Stewart, and the victim, Anthony Bennefield. That hostility manifested itself in several violent altercations between members of the two groups.

On May 5, 1999, Jenkins unsuccessfully attempted to drive Pope off the road with his Chevrolet Lumina, and, when he was unsuccessful, Jenkins fired shots in Pope's direction as he drove away. Around 8 p.m. that same day, Stewart saw the petitioner driving a gold Chevrolet Monte Carlo along the same street as the victim was walking. He then heard the sound of two gunshots and observed the victim "hit the ground." After the petitioner drove away, the victim approached Stewart and told him that the petitioner had fired the shots in his direction but that he was unsure whether the petitioner was trying to shoot him. Later that night, the victim, Stewart, and others celebrated the victim's birthday at a local night club. At some point that evening, the victim went outside and fell asleep in the Lumina, which was parked in front of the club. At around 1:30 a.m., Stewart, Joseph Smith, and two other men, left in the Lumina with the victim, who was still asleep. Shortly after driving away from the club, Stewart pulled over to the side of Lenox Street, and several of the vehicle's occupants smoked marijuana.

Thereafter, the petitioner pulled very closely along the driver's side of the Lumina in the Monte Carlo and fired four shots in its direction. After the petitioner had driven away, Stewart and the other men in the Lumina realized that the victim had been shot. Police and emergency medical personnel arrived on the scene shortly after one of the men summoned help, but the victim ultimately died from his injuries.

On May 6, 1999, the day after the shooting, the police took a voluntary statement from Smith, who recalled another passenger yelling, "that's Troy," when the Monte Carlo pulled up. On May 8, 1999, the police took a voluntary statement from Stewart, who recalled hearing someone yell, "Yo, that's Troy," and observed someone

that appeared to be the petitioner just before shots were fired. On May 13, 1999, the police took a voluntary statement from Jesse Campbell. Campbell explained that just prior to the shooting the petitioner pulled into a Kentucky Fried Chicken restaurant in a Monte Carlo and parked next to him. Campbell stated that he recognized the petitioner because they had lived near each other for about two years, and they waved to each other while in the parking lot. A short while later, Campbell watched as the Monte Carlo turned off its headlights, proceeded down Lenox Street, and drove alongside the Lumina. He then heard shots being fired and observed flashes coming from the Monte Carlo. The Monte Carlo sped away, and Campbell observed the petitioner as its only occupant. Campbell identified a picture of the Monte Carlo as the vehicle he saw the petitioner driving on night of the shooting, and he identified a photograph of the petitioner from a photographic array.

The petitioner was tried and convicted of murder in violation of General Statutes § 53a-54a in Hartford in 2000. At trial, the state's evidence included the following relevant testimony from Campbell, Smith, and Stewart. Campbell testified about his observation of the Monte Carlo and the petitioner on the night of the shooting. He also identified the petitioner in court, and he identified the photograph of petitioner he selected from a photographic array he was shown when he gave his statement to the police. Smith testified that he was a passenger in the Lumina when the shooting occurred, but he stated that he did not see who fired the shots because he "ducked" down until after the shooter drove away. He also explained that he did not remember much about the night of the shooting because he had consumed about six shots of alcohol and six marijuana joints and had suffered permanent memory loss from a brain injury in August 1999. Finally, Stewart testified that he was driving the Lumina on the night of the shooting and that he remembered a Monte Carlo pulling up very closely alongside the Lumina. Stewart testified that he looked into the Monte Carlo to see who was driving and, seconds before the shots were fired, shouted, "That's Troy!" Stewart also stated that he recognized the Monte Carlo as being the same vehicle that he had seen the petitioner driving earlier that evening. After his conviction, the petitioner filed a direct appeal, and this court affirmed the petitioner's conviction on March 19, 2002. *State* v. *Westberry*, 68 Conn. App. 622, 638, 792 A.2d 154, cert. denied, 260 Conn. 923, 797 A.2d 519 (2002).

On December 30, 2003, Campbell and his mother had a conversation over a monitored telephone line while he was incarcerated on unrelated criminal charges. During that conversation, Campbell opined that the prosecutor recently discussed in open court the fact that he testified for the state in the petitioner's criminal trial. In the recorded conversation, Campbell repeatedly expressed

his concern that people in jail were going to find out that he testified for the state. At one point during the conversation, Campbell said: "Well of course that I lied; I don't know nothing about that shit, what?" The recording of the conversation between Campbell and his mother subsequently was disclosed to the petitioner.

On January 14, 2003, the petitioner filed his first petition for a writ of habeas corpus, in which he claimed actual innocence and a due process violation based on Campbell's purported perjury. *Westberry* v. *Commissioner of Correction*, Superior Court, judicial district of New Haven, Docket No. CV-03-0473101-S, (September 15, 2011), aff'd, 141 Conn. App. 901, 59 A.3d 1205 (2013). On June 7, 2011, the first habeas court, *Zoarski, J.*, conducted an evidentiary hearing at which the petitioner presented the testimony of James Ouludsen, the petitioner's investigator, and Assistant State's Attorney Vicki Melchiorre.[2] Ouludsen testified that on June 17, 2007 he interviewed and took a statement from Campbell. In that statement, Campbell denied knowing the petitioner or seeing him at the time of the shooting incident and admitted to lying at the petitioner's criminal trial. Melchiorre testified that she was the attorney that prosecuted the petitioner at his criminal trial. She testified that Campbell was reluctant to testify at the petitioner's criminal trial because he was concerned about his safety in prison and because "he didn't want to be labeled as a snitch." On September 15, 2011, the first habeas court denied the petitioner's first habeas petition because the petitioner failed to establish that he was actually innocent of murder or that his conviction was the result of a due process violation. *Westberry* v. *Commissioner of Correction*, supra. In particular, the first habeas court found that it could not "judge the credibility of the alleged recantations of Jesse Campbell in the absence of his testimony under oath and subject to cross-examination." Id. This court summarily affirmed the judgment of the first habeas court. *Westberry* v. *Commissioner of Correction*, 141 Conn. App. 901, 59 A.2d 1205 (2013).

On June 5, 2012, Smith participated in a proffer session[3] with federal authorities in which he stated that he had lied at the petitioner's criminal trial about not remembering anything about the shooting incident. He claimed that when the petitioner pulled alongside the Lumina, he observed "Bub," subsequently identified as Lorenza Mack, in the front passenger seat of the Monte Carlo . At the proffer session, Smith stated that he attempted to fire a nine millimeter firearm at the Monte Carlo, but the firearm malfunctioned and did not fire.[4] Smith then claimed that he saw Mack produce a firearm and shoot at the Lumina before he and the petitioner drove away. After the proffer session, a federal agent that participated in the proffer session prepared a written report summarizing Smith's statements (proffer

statement). A copy of the proffer statement was subsequently provided to Smith and the petitioner.

On November 19, 2014, the petitioner filed an amended petition for a writ of habeas corpus (second habeas petition), which is the subject of this appeal. In this action, the petitioner alleged actual innocence and a due process violation based on the purported perjury of Campbell and Smith at his criminal trial.[5] On January 5, 2015, the second habeas court, *Schuman, J.,* conducted hearing trial at which the petitioner presented the testimony of the following witnesses.[6]

The first witness presented by the petitioner was Smith, who testified by telephone from a federal correctional facility. During his testimony, Smith stated that he never reviewed the proffer statement, and he disagreed with the federal agent's summary of his statements on multiple occasions, particularly concerning the order of events during the shooting incident.[7] Smith also provided equivocal testimony concerning the shooting itself. Smith stated on multiple occasions that he "believed" that Mack was the shooter rather than petitioner[8] because that was the rumor on the street. In particular, Smith explained that "being that I was younger than most of them, I never really knew them [i.e., the petitioner or Mack], but I was in the car that night and that's who everybody believes it was [i.e., Mack]. That was the rumor on the street."

The petitioner then presented the testimony of Jill Therriault, a forensic firearms examiner, and Stewart to corroborate Smith's proffer statement to federal authorities. Therriault testified that she inspected the unfired nine millimeter cartridges that were recovered from the scene of the shooting, but she could not identify or eliminate them as having been cycled through the type of firearm Smith said he attempted to shoot at the Monte Carlo. Stewart testified that a defense investigator had shown him Smith's proffer statement, but, during the second habeas trial, he gave equivocal testimony concerning its accuracy. On direct examination, Stewart was asked whether Smith's proffer statement said that "Mack was the shooter and that he fired and Troy drove away," and Stewart replied, "Yes." Stewart was then asked, "isn't that true?" and he replied, "Yes." On cross-examination, however, Stewart acknowledged that in his statement to the police on May 8, 1999, two days after the shooting, he never mentioned Mack. He also acknowledged that he never mentioned Mack at trial and that he testified that he yelled, "That's Troy," when the Monte Carlo pulled up next to them. On redirect examination, Stewart was asked again if Smith's proffer statement was "the true version of the events," and he replied, "Sort of, yes." Later, when asked about whether he remembered Smith attempting to shoot at the Monte Carlo, Stewart replied, "I don't know about that," and when he was asked if he wanted

to look at Smith's statement again, he replied, "Something ain't right."

The petitioner's final two witnesses were Thomas Davis and Jason Douglas, who were called to establish that Mack shot the victim, not the petitioner. Davis testified that Mack was "jumped" by the victim and two other men three months before the shooting. Douglas, a defense investigator, testified about his interview of Guy Eugene, who is currently serving a sentence for killing Mack. Douglas explained that Eugene told him that he killed Mack in retaliation for the victim's death, and he then prepared a written statement of their discussion. Douglas stated that he gave Eugene an opportunity to look at his notes but that Eugene declined to sign the statement he prepared.

In addition to the testimony of these witnesses, the habeas court admitted several exhibits, including all of the transcripts from the petitioner's criminal trial, the transcripts from the petitioner's first habeas trial, Campbell's telephone conversation with his mother, Campbell's sworn statement,[9] Smith's proffer statement,[10] and the affidavit by Douglas in which he memorialized Eugene's purported statements to him (Eugene's statement).[11]

On February 18, 2015, the second habeas court issued a written memorandum of decision denying the petitioner's second habeas petition. In that memorandum, the court discredited the testimony and statements of Smith and Stewart as well as the statements made by Campbell and Eugene.[12] Concerning Smith, the court found that his testimony at the hearing was not credible because "his testimony at the hearing on the shooting was hesitant, saying he does not 'believe' the shooter was the petitioner and that he 'believes' the shooter was Lorenza Mack. He also admitted that some of his proffer, particularly concerning the order of events during the shooting incident, was wrong." The court observed: "It is hard to see how he could have remembered so little in 2000, one year after the shooting, perhaps understandably because he was under the influence of alcohol and drugs, and yet recant and identify the shooter twelve and fourteen years after the incident."

Concerning Stewart, the court noted that Stewart's testimony was "extremely hesitant" and that "[h]e provided only reluctant answers in response to leading questions." The court observed: "There was no mention in [Stewart's] virtually contemporaneous [sworn] statement [to the police two days after the shooting] of Lorenza Mack or Bub, thus casting grave doubt on the veracity of Stewart's testimony at the habeas trial over fourteen years later."

Concerning Campbell, the court found that, after reviewing Campbell's phone call and sworn statement, "it cannot put any weight on his alleged recantations

in the absence of seeing Campbell in person and having him face cross-examination."

Finally, the court "attach[ed] no weight to Eugene's statement" because "[t]he affidavit consisted of the investigator's rendition of Eugene's oral statements," "Eugene himself declined to sign a written statement," and the affidavit stated that Eugene would be willing to testify in court, which was untrue. The court also observed: "Eugene's motive or state of mind as to why he would kill Mack is essentially irrelevant and does not in any way constitute reliable evidence as to who killed [the victim]."[13]

In its memorandum of decision, the second habeas court also rejected the petitioner's actual innocence and due process claims. The court articulated several bases for its conclusion. In relevant part, the court rejected the petitioner's actual innocence claim on the merits because he "failed to prove by clear and convincing evidence that he is actually innocent of murder and that no reasonable jury would find him guilty." In particular, the court observed that "[t]he petitioner's case instead rested almost entirely on the recantations of the key witnesses," and "[o]ur law views such recantations with skepticism." Furthermore, the court explained that "there are good reasons to remain highly skeptical of the recantations in this case. In addition to those specific reasons, there is the more general concern that the petitioner did not offer any valid explanation, such as a mistaken identification, why the recanting witnesses would all proceed to provide false testimony at the criminal trial and, with the exception of Smith, implicate the petitioner."

The court also rejected the petitioner's due process claim on the merits. The court first explained that the petitioner had withdrawn the claim in his petition that the state knew or should have known that false testimony was presented at the criminal trial. Nonetheless, the court explained that the petitioner, relying on *Ortega v. Duncan*, 333 F.3d 102 (2d Cir. 2003), claimed that "the court should grant habeas relief because the jury relied on perjured, material testimony, even if the state did not know . . . of the perjury." Although the court observed that "Connecticut . . . has not adopted the *Ortega* rule," it nonetheless held that, regardless, the defendant could not prevail under the *Ortega* standard because he failed to establish that "the witnesses presented false testimony at trial and that their recantations are true."

I

We first address the petitioner's claim that the habeas court erroneously concluded that his due process rights were not violated by the use of perjured testimony at his criminal trial. The petitioner has withdrawn any claim that the state knew or should have known that

it was presenting purportedly perjured testimony, and, instead, he argues that "the use of perjured testimony [in his criminal trial], even absent the [s]tate's knowledge, is a violation of due process. . . ." It remains an open question in Connecticut whether the state's *unknowing* use of perjured testimony at trial can violate due process. *Gould* v. *Commissioner of Correction*, 301 Conn. 544, 570–71 and n.18, 22 A.3d 1196 (2011). The majority of jurisdictions require a habeas petitioner to prove that the state knew or should have known that it was presenting false testimony to raise a due process claim. Id., 570 n.18. However, a minority of jurisdictions, including the United States Court of Appeals for the Second Circuit, have held that the use of perjured testimony at trial by itself, even without the state's knowledge of its falsity, can give rise to a due process claim. Id; see, e.g., *Ortega* v. *Duncan*, supra, 333 F.3d 108. We conclude that it is unnecessary for us to resolve whether Connecticut recognizes a due process claim based on the state's unknowing use of perjured testimony because we agree with the second habeas court that the petitioner failed to establish that perjured testimony was used at his criminal trial.

To support his claim that his conviction was based on the use of perjured testimony, the petitioner relies on Campbell's and Smith's recantations. However, the habeas court explicitly discredited these recantations. It is well established that "[t]his court does not retry the case or evaluate the credibility of witnesses. Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *Jackson* v. *Commissioner of Correction*, 149 Conn. App. 681, 711, 89 A.3d 426 (2014), appeal dismissed, 321 Conn. 765, 138 A.3d 278 (2016) (certification improvidently granted). We cannot disturb the underlying credibility determinations or facts found by the habeas court unless they are clearly erroneous. *State* v. *Buhl*, 321 Conn. 688, 708, 138 A.3d 868 (2016). The petitioner has failed to establish that the second habeas court's credibility determinations were clearly erroneous.

Concerning Campbell, the court reasonably concluded that "it [could not] put any weight on [Campbell's] alleged recantations in the absence of seeing Campbell in person and having him face cross-examination." The petitioner maintains that the court could have, and should have, credited Campbell's recantation because Campbell invoked his fifth amendment right against self-incrimination and his statements were admitted as statements against penal interest, which requires "a judicial determination of trustworthiness" and "must be accorded equivalent consideration as testimony . . . ."[14] We disagree. The court acted well within its discretion by declining to speculate as to why Campbell invoked his fifth amendment right not

to testify. See *Skakel* v. *State*, 295 Conn. 447, 500, 991 A.2d 414 (2010). The petitioner also erroneously conflates admissibility with weight. When the habeas court determined that Campbell's statements were admissible, it was engaging in a gatekeeping function. See id. The court simply determined that the evidence met the threshold that would allow it to *consider* the evidence. It was not acting in its capacity as the trier of fact to determine whether it would find the evidence credible. See id., 479.[15] The mere fact that a court determines that evidence is admissible under the Connecticut Code of Evidence does not mean that the trier of fact must ultimately credit that evidence.

The court also had an adequate factual basis for discrediting Smith. Smith's testimony was hesitant and equivocal, and he merely stated that he "believes" that Mack was the shooter, not that he *knows* that Mack was the shooter. Additionally, Smith repeatedly corrected portions of the proffer statement, particularly the details concerning the order of events during the shooting. The petitioner maintains that the court clearly erred in its credibility determination because Smith's recantation was corroborated by Eugene's statement and Stewart's and Theriault's testimony. However, the court discredited Eugene's statement because it was neither written nor signed by him and the investigator's affidavit contained an incorrect assertion that Eugene was willing to testify at the habeas trial. Additionally, Eugene's statement merely addressed his purported reason for killing Mack. The court also discredited Stewart's recantation because his testimony about the night of the shooting was "extremely hesitant" and he was reluctant to answer even leading questions. Finally, although the court credited Theriault's testimony, that testimony merely established that two nine millimeter bullets were recovered from the Lumina and that they would fit in Smith's firearm, not that Smith saw Mack during the shooting incident.

Therefore, we conclude that the second habeas court did not err in rejecting the petitioner's due process claim.

## II

We now turn to the petitioner's claim that he is actually innocent. We begin our analysis by setting forth the relevant legal principles and standard of review that governs our analysis. In *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 791–92, 700 A.2d 1108 (1997), our Supreme Court articulated the standard of proof that a habeas corpus petitioner must satisfy in order to prevail on a claim of actual innocence: "First, taking into account both the evidence produced in the original criminal trial and the evidence produced in the habeas hearing, the petitioner must persuade the habeas court by clear and convincing evidence, as that standard is properly understood and applied in the con-

text of such a claim,[16] that the petitioner is actually innocent of the crime of which he stands convicted. Second, the petitioner must establish that, after considering all of that evidence and the inferences drawn therefrom . . . no reasonable fact finder would find the petitioner guilty."[17] (Footnote added.) Id., 791–92.

Under the first *Miller* prong, actual innocence means "factual innocence," not "legal innocence," and must be "demonstrated by *affirmative proof* that the petitioner did not commit the crime." (Emphasis added.) *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 560–61. "Affirmative proof of actual innocence is that which might tend to establish that the petitioner *could not* have committed the crime even though it is unknown who committed the crime, that a *third party* committed the crime or that *no* crime actually occurred." (Emphasis in original.) Id., 563. "Recantations of inculpatory criminal trial testimony undoubtedly are relevant to a determination of innocence. But evidence of that nature must be accompanied by *affirmative* evidence of innocence to meet *Miller's* standard of clear and convincing evidence.[18] (Emphasis in original.) Id., 564.

Our standard of review for claims of actual innocence is twofold. "The appropriate scope of review [for the first *Miller* prong] is whether, after an independent and scrupulous examination of the entire record, we are convinced that the finding of the habeas court . . . is supported by substantial evidence." *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 803. In contrast, the plenary standard of review applies to the second *Miller* prong. Id., 805.

In the present case, the petitioner's claim of actual innocence is based on Campbell's and Smith's *discredited recantations* as well as Eugene's *discredited statement*. The petitioner offers no credible or affirmative evidence of his actual innocence. The only nonrecantation evidence offered at the second habeas trial was evidence that (1) two nine millimeter bullets were recovered from the Lumina, (2) Mack was "jumped" by the victim and two other men three months before the shooting, and (3) Eugene shot Mack because he believed, based on street rumors, that Mack shot the victim. Even if this evidence were accepted as true, none of it constitutes affirmative evidence of the petitioner's actual, factual innocence. "[I]t is important to underscore that courts universally view recantation evidence with a healthy dose of skepticism." *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 568. One of the reasons that reviewing courts are highly skeptical of recantations is that recantations can often be out of sympathy for the petitioner rather than a desire to "come clean" about prior perjury. Id., 568 n.17. Our review of the record reveals that the impetus for the witnesses' recantations might well be the *street rumors*

that Mack was the shooter, rather than personal knowledge that Mack was in the Monte Carlo the night of the shooting and that Mack shot the victim.[19]

We conclude for the foregoing reasons and after an independent and scrupulous examination of the entire record that the habeas court did not err in denying the petitioner's actual innocence claim because the petitioner did not meet his burden under the first prong of *Miller*.[20]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The habeas court granted the petition for certification to appeal. See General Statutes § 52-470.

[2] The petitioner attempted to call Campbell as a witness at his first habeas trial, but Campbell invoked his fifth amendment right against self-incrimination.

[3] Under the federal sentencing guidelines, the federal government may file a motion on behalf of a defendant that has "provided substantial assistance in the investigation or prosecution of another person who has committed an offense" in which it asks the court to depart from the sentencing guidelines at sentencing, including a departure below a mandatory minimum sentence. U.S.S.G. § 5K1.1. A "proffer session" is the meeting between federal authorities, the defendant, and his counsel at which the defendant makes a statement concerning his or other individuals' criminal conduct. Depending on the content of the defendant's statement and his credibility, the government may or may not filed a § 5K1.1 motion with the court prior to sentencing. At sentencing, when deciding whether to depart from the guidelines based on a § 5K1.1 motion, the court may consider, inter alia, "the truthfulness, completeness, and reliability of any information or testimony provided by the defendant." U.S.S.G. § 5K1.1 (a) (2).

[4] During his brief, and reluctant, trial testimony, Smith did not mention that he attempted to shoot at the Monte Carlo. In relevant part, he engaged in the following colloquy with the prosecutor:
"Q. All right. Do you recall seeing whether or not a car pulled up next to you?
"A. Yeah. A car pulled up. Yeah, a car pulled up.
"Q. Okay. Then what happened?
"A. They started shooting. Somebody started shooting.
"Q. Okay. Did you see who started shooting? Is that a no?
"A. No.
"Q. What did you see?
"A. I seen—I just looked. I seen a car, and I ducked. I just ducked.
"Q. You always duck every time a car comes near you? What made you duck?
"A. 'Cause
"Q. 'Cause why?
"A. 'Cause, you know, I just ducked."

[5] The respondent, the Commissioner of Correction, argues that any claim of actual innocence or a due process violation based on Campbell's recantation is barred by the doctrine of res judicata. As we have disposed of the petitioner's claim on other grounds, we need not address this argument. See *Edwards* v. *Commissioner of Correction*, 141 Conn. App. 430, 431 n.1, 63 A.3d 540, cert. denied, 308 Conn. 940, 66 A.3d 882 (2013); *Cole* v. *Commissioner of Correction*, 126 Conn. App. 775, 777 n.1, 12 A.3d 1065 (per curiam), cert. denied, 300 Conn. 937, 17 A.3d 473 (2011).

[6] The petitioner attempted to call Campbell and Eugene to testify, but they both invoked their fifth amendment right against self-incrimination.

[7] For example, the following exchange occurred between the petitioner's counsel and Smith during direct examination:
"Q. Okay. Sir, if I read you the portion of the proffer session, would that refresh your recollection as to the order of events?
"A. It might.
"Q. Okay. It says: 'Smith attempted to fire the TEK-9 at [the petitioner's] car but the TEK-9 malfunctioned and didn't fire. Smith then saw Bub [i.e., Mack] produce a firearm and proceed to shoot in the car occupied by Smith.' Does that refresh your recollection?
"A. No, I don't think it happened like that.
"Q. No, you don't think it happened like that?

"A. No.

"Q. All right. This is certainly what you told the [federal] agents.

"A. No.

"Q. At any time with your discussions with your lawyers or [the federal] prosecutors or the [federal] agents, did you ever tell them that you were fired upon first and then you tried to fire?

"A. I'm not sure.

"Q. All right. After—you know that you were ordered to be truthful in this statement. Correct?

"A. Correct.

"Q. And that the 5K [motion] would not be given to you unless you told the truth to the [federal] agents and to the [assistant United States attorney].

"A. That's true.

"Q. And now you're saying that what's in the report is not true.

"A. I'm not saying that. I'm just saying I can't remember if that's how it happened.

"Q. Well, can you not remember?

"A. No, you know, I also had a brain injury.

"Q. Okay. We understand that, but when you spoke to the [federal] agents, you gave them [a] very specific order as to how things happened, isn't that correct, according to this report?

"A. It could appear like that, but I don't believe that's how it happened.

"Q. All right. Well, did you make any corrections to the [federal] agent's report?

"A. No, I never seen it."

[8] For example, the following exchange occurred between the petitioner's counsel and Smith during direct examination:

"Q. . . . Do you recall a car pulling up alongside the car that you were in?

"A. Yeah.

"Q. Do you recall being able to see the driver of the car?

"A. I mean it was blurry, but yeah.

"Q. Okay. And who was the driver?

"A. Well, *I believe* it was [the petitioner's].

"Q. Okay.

"A. That's what *I believe*.

"Q. All right. Could you see someone else in the front seat passenger of [the petitioner's] car?

"A. Yeah.

"Q. And who was that?

"A. *I believe* that was, um, Bub.

"Q. Okay. Is Bub also known as Lorenz[a] Mack?

"A. Yeah.

* * *

"Q. Okay. And so did you attempt to shoot at [the petitioner's] car?

"A. I think they fired. They already fired."

* * *

"Q. And you reiterated is it true that [the petitioner]] did not shoot or fire on the car that you were in. Is that correct?

"A. Yeah, *I don't believe* it was him." (Emphasis added.)

[9] A transcript and recording of Campbell's phone conversation and Campbell's sworn statement were admitted as statements against penal interest.

[10] The petitioner offered and the court admitted Smith's proffer statement as a prior inconsistent statement.

[11] When Eugene invoked his fifth amendment right against self-incrimination, the court admitted Douglas' affidavit about their meeting into evidence only for nonhearsay purposes, i.e., for establishing that Eugene's motive for killing Mack was his belief, based on street rumors, that Mack killed the victim.

[12] The court credited the testimony of Davis and Therriault, but ultimately concluded that their testimony did not support the petitioner's claim.

[13] The court emphasized that the investigator's description of Eugene's claim that " 'it is well known on the street' " that Mack killed the victim was not admitted "for the truth of the matter but rather it [was admitted] only for the nonhearsay purpose of showing Eugene's motive or state of mind, to the extent that the latter was relevant."

[14] Section 8-6 (4) of the Connecticut Code of Evidence provides: "Statement against penal interest. A trustworthy statement against penal interest that, at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. In determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evi-

dence in the case, and (C) the extent to which the statement was against the declarant's penal interest."

[15] We note that the petitioner argues in his brief that *Skakel* supports his argument that "the only adverse inference that may be logically inferred [from Campbell's invocation of his fifth amendment right], is that Jesse Campbell's trial testimony was perjured." In particular, he quotes a portion of the Supreme Court's summary of the trial court's memorandum of decision, without attribution, to support his assertion that "[b]y refusing to testify as to the veracity of his testimony at the [p]etitioner's criminal trial, Mr. Campbell is acknowledging criminal liability [from his trial testimony]." We observe that *Skakel* is squarely adverse to the petitioner's position with respect to Campbell. In *Skakel*, the defendant sought a new trial based on statements by Gitano Bryant that inculpated two other persons in the victim's murder. *Skakel* v. *State*, supra, 295 Conn. 468. While the court admitted Bryant's statement as a statement against penal interest after Bryant invoked his fifth amendment right against self-incrimination, it ultimately did not credit Bryant's statement. Id., 473–77. In affirming the trial court's decision, the Supreme Court not only "decline[d] to speculate as to why Bryant invoked his fifth amendment right not to testify" but also held that the court did not abuse its discretion by "concluding that Bryant's account, while sufficiently trustworthy to be admissible, 'is absent any genuine corroboration . . . lacks credibility, and therefore, would not produce a different result in a new trial.' " Id., 500–501.

[16] "The clear and convincing standard of proof is substantially greater than the usual civil standard of a preponderance of the evidence, but less than the highest legal standard of proof beyond a reasonable doubt. It is sustained if the evidence induces in the mind of the trier a reasonable belief that the facts asserted are *highly probably* true, that the probability that they are true or exist is *substantially greater* than the probability that they are false or do not exist. . . . [T]he clear and convincing evidence standard should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory." (Emphasis in original; footnote omitted; internal quotation marks omitted.) *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 794–95.

[17] "There are two types of actual innocence claims: Gateway and freestanding. In a freestanding claim of actual innocence, 'there is no claim of an antecedent constitutional violation that affected the result of [the] criminal trial. Such a freestanding claim is to be contrasted with what has come to be known in federal habeas jurisprudence as a "gateway" claim of actual innocence. Such a claim serves as a gateway to permit federal habeas review of an otherwise procedurally barred state conviction that the petitioner asserts is constitutionally flawed'; *Miller* v. *Commissioner of Correction*, [supra, 242 Conn. 788 n. 28]; it is '[a] claim based on an antecedent constitutional violation that affects the results of the criminal trial . . . .' Id., 813 n. 7 (*Berdon, J.*, concurring and dissenting)." *Rivera* v. *Commissioner of Correction*, 70 Conn. App. 452, 461 n.2, 800 A.2d 1194, cert. denied 261 Conn. 921, 806 A.2d 1061 (2002).

The petitioner contends that he has asserted a "gateway" claim of actual innocence and that the habeas court erred in failing to apply the federal standard for review of gateway claims of actual innocence set forth by the United States Supreme Court in *Schlup* v. *Delo*, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995). We disagree. "Neither this court nor our Supreme Court has expressly recognized the viability of a gateway claim of actual innocence in this state. In the federal courts, a habeas petitioner may assert a claim of actual innocence to circumvent a procedural obstacle [under federal statutory law] that would otherwise operate to bar review of a claim of constitutional error affecting the criminal trial. See [*Schlup* v. *Delo*, supra], 314. Such an actual innocence claim is thus 'a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.' *Herrera* v. *Collins*, 506 U.S. 390, 404, 113 S. Ct. 853, 112 L. Ed. 2d 203 (1993)." *Rivera* v. *Commissioner of Correction*, supra, 70 Conn. App. 461; see also *Rivas* v. *Fischer*, 687 F.3d 514, 541 (2d Cir. 2012) ("A claim of actual innocence under *Schlup* is therefore procedural, not substantive. . . . The petitioner raising such a claim does not seek to have his conviction vacated on grounds of innocence; rather, he seeks to create sufficient doubt about his guilt that the habeas court will permit him to pursue his accompanying constitutional claims notwithstanding an otherwise applicable procedural bar." [Citation omitted.]). In the present case, the petitioner was not confronted with any procedural impediments to review of his actual innocence claim, and, indeed, the habeas court and this court have fully addressed the merits of that claim. The petitioner was therefore in no need of a "gateway."

[18] Our Supreme Court has not addressed whether a habeas petitioner must support his claim of actual innocence with newly discovered evidence. "This court, nevertheless, has held that a claim of actual innocence must be based on newly discovered evidence. [A] writ of habeas corpus cannot issue unless the petitioner first demonstrates that the evidence put forth in support of his claim of actual innocence is newly discovered. . . . This evidentiary burden is satisfied if a petitioner can demonstrate, by a preponderance of the evidence, that the proffered evidence could not have been discovered prior to the petitioner's criminal trial by the exercise of due diligence." (Internal quotation marks omitted.) *Jackson* v. *Commissioner of Correction*, supra, 149 Conn. App. 707–708.

In the present case, the second habeas court concluded that the recantation and Eugene's statement were not newly discovered evidence because none of it "negates the fact that the petitioner was driving the car at the time of the shooting." Therefore, the petitioner certainly would have known at the time of trial that Mack was the real shooter, and he might have known who saw him and Mack together at the time of the shooting. We have held that information that the petitioner "had personal knowledge of from his own experience and activities . . . is not, as a matter of law, newly discovered evidence." *Morant* v. *State*, 68 Conn. App. 137, 147, 802 A.2d 93, cert. denied, 260 Conn. 914, 796 A.2d 558 (2002), overruled on other grounds, *Shabbaz* v. *State*, 259 Conn. 811, 830 n.13, 792 A.2d 797 (2002); see, e.g., *State* v. *White*, 76 Conn. App. 509, 513, 819 A.2d 932 (2003) (victim's recantation did not constitute newly discovered evidence where defendant knew at time of plea hearing that victim, who had resumed a relationship with the defendant, was uncooperative with police, and wanted to avoid his incarceration). The petitioner maintains, however, that "[t]he newly discovered evidence is not Mr. Mack's culpability, but rather the recantations of three of the [s]tate's witnesses: Jesse Campbell, Joseph Smith, and Dwayne Stewart."

Even if we assume, without deciding, that the recantations and Eugene's statement constitute newly discovered evidence, however, the petitioner's actual innocence claim fails on the merits.

[19] "They say" is often a great liar, according to the Irish proverb. Accord Conn. Code Evid. § 8-2.

[20] Accordingly, we need not address whether the petitioner has satisfied *Miller*'s second prong. See *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 559 n.14 ("That examination [of the *Miller* test] suggests to us that there may not be any case in which the first prong [of the *Miller* test] is not dispositive of the petition. . . . Indeed . . . the first prong of *Miller* sets forth the heart of an actual innocence claim."); see, e.g., *Jackson* v. *Commissioner of Correction*, supra, 149 Conn. App. 713–14.