**Ruben ORTEGA, Petitioner–Appellant,**

v.

**George DUNCAN, Respondent–Appellee.**

**Docket No. 01–2629.**

United States Court of Appeals, Second Circuit.

Argued Jan. 27, 2003.

Decided June 17, 2003.

Steven B. Wasserman, New York, N.Y. (The Legal Aid Society, of counsel), for Petitioner–Appellant.

Monique Ferrell, Assistant District Attorney, Kings County, Brooklyn, N.Y. (Charles J. Hynes, District Attorney, and Leonard Joblove and Jane S. Meyers, Assistant District Attorneys, of counsel), for Respondent–Appellee.

Before OAKES, CALABRESI and SACK, Circuit Judges.

OAKES, Senior Circuit Judge.

Petitioner Ruben Ortega seeks habeas relief on the grounds that his murder conviction in state court was obtained on the perjured testimony of a purported witness

to the crime. The witness, Dana Garner, originally testified that he saw Ortega shoot the victim but later recanted this testimony. Garner also recanted testimony in two other cases, both of which resulted in the dismissal of charges against those defendants. The United States District Court for the Southern District of New York, John Gleeson, *Judge,* held that the state court had erroneously denied Ortega post-conviction relief and granted a hearing on the truthfulness of Garner's recantation. The district court then denied Ortega's habeas petition, finding Ortega did not meet his burden of proving that Garner told the truth in his recantation and therefore had lied in his trial testimony. Because we find that the district court erred in focusing solely on the credibility of Garner's recantation rather than on the question of whether Garner's trial testimony was perjured, we reverse.

### BACKGROUND

In the very early morning of June 25, 1990, three men, Lionel Diaz, Ricardo Betances, and Angel Narvaez, were standing on a street corner in Brooklyn when a car pulled up. Three men exited the car, two carrying guns, and one shot Diaz in the chest at close range. As Betances and Narvaez fled, the men shot at them, hitting both of them in the back. Diaz died at the scene; the other two survived.

On June 27, 1990, Dana Garner went to the local police precinct to discuss a murder that had occurred a week earlier in which he claimed to have seen Jeffrey Blake commit the crime.[1] While he was there, the police asked him if he knew anything about the events of June 25th. Garner admitted to knowing the victims, and identified Ruben Ortega as one of the men in the car. Although Garner did not

initially name Ortega as the man who shot Diaz, he later identified Ortega in a photo array as the shooter. Garner confirmed his identification of Ortega in a lineup on June 28, 1990. A grand jury indicted Ortega on charges of second-degree murder on July 26, 1990.

At Ortega's trial, Garner testified as follows. At approximately 4:15 a.m. on June 25th, he was going to meet his mother at the subway station when he saw a small car containing a driver and two passengers approach three men standing at an intersection. Garner then saw two men, one of whom he recognized as Ortega, exit the car carrying guns. He saw Ortega walk toward the three men and shoot Diaz in the chest with a pump-action shotgun. The other gunman then started shooting Diaz with a handgun as Diaz lay on the ground. Ortega then shot Narvaez in the back with the shotgun. As Narvaez began to run away, the other gunman fired at him until he fell. Garner then met his mother, who arrived in time to see the victims lying in the street.

Betances and Narvaez also testified at Ortega's trial. Betances testified that Ortega got out of the back seat of the car, pointing a shotgun at Betances, Narvaez, and Diaz, and approached Diaz. After an exchange of words, Ortega shot Diaz in the chest. As Betances ran away, he heard more shots and was hit in the back by a shot from the shotgun.

Narvaez testified for the defense. He testified to the same sequence of events as Betances, including being shot himself in the back by the shotgun, but stated that Ortega was not the shotgun shooter. He also testified that he did not see Garner, whom he knew, that night. On cross-examination, the prosecution read the de-

---

1. Garner later recanted his testimony in the Blake case, resulting in the dismissal of

Blake's murder conviction after Blake had served more than seven years of his sentence.

scription that Narvaez gave of the shotgun shooter a week after the events, which more closely matched a description of Ortega than the one Narvaez gave at trial. On re-direct, Narvaez testified that Ortega's mother visited him after he was released from the hospital, showed him a photo of Ortega, and asked if Narvaez recognized the person. Narvaez said he did not.

In March 1991, Ortega was convicted by a jury of Diaz's murder and began serving his sentence of twenty-five years to life. His appeals in state court were unsuccessful. *See People v. Ortega*, 214 A.D.2d 591, 625 N.Y.S.2d 574 (2d Dep't 1995); *People v. Ortega*, 86 N.Y.2d 739, 631 N.Y.S.2d 619, 655 N.E.2d 716 (1995).

In December 1998, the District Attorney informed Ortega's counsel that Garner had testified falsely at Jeffrey Blake's trial. The District Attorney's office investigated Garner's testimony after receiving information that Garner was not in the New York area at the time of the murder for which Blake was tried. Garner recanted his testimony about Blake and, because Blake's conviction was obtained solely on the basis of that testimony, the District Attorney vacated the conviction and dismissed Blake's indictment.

The Legal Aid lawyer who now represents Ortega met with Garner in May 1999. At that time, Garner executed an affidavit in which he stated that he was not present when Diaz, Betances, and Narvaez were shot, and that he had lied when he testified that his mother was with him and witnessed the victims lying in the street. He further stated that when he visited the

75th Precinct on June 27, 1990, two police detectives told him the details of the shooting and suggested he should testify as if he had witnessed it.[2]

In October 1999, Ortega filed a § 440 Motion with the state court seeking to set aside his conviction on the basis of the newly-discovered evidence of Garner's recantation. The court held a hearing at which Garner reiterated his recantation of his testimony at Ortega's trial. Additionally, an investigator with the District Attorney's office testified that Garner's mother stated in an interview that she did not recall seeing a shooting, that Dana did not typically meet her at the subway, and that it would have been unusual for her to be coming home to Brooklyn at that time. A cousin of Garner's also testified to Garner's reputation in the family as a liar. In response to this evidence, the state offered an affidavit from Narvaez in which he recanted his testimony at Ortega's trial and stated that Ortega was the man who shot Diaz and Narvaez with the shotgun.

The court denied Ortega's § 440 motion on the ground that the issues surrounding Garner's testimony would not lead the jury to reach a different verdict. The court explicitly refused to make a finding on the credibility of Garner's recantation, and later indicated in conference that, because of Narvaez's recantation, the outcome of a new trial for Ortega would be the same regardless of Garner's credibility.

In August 2000, Ortega filed a petition for habeas corpus in federal court, claiming on the basis of newly-discovered evidence that his due process rights were violated when Garner testified falsely at

---

**2.** At this same meeting, Garner also executed an affidavit recanting testimony he had given against James Crosby, who had been convicted, along with three others, of kidnapping Garner in 1988. In December 1999, the state court granted Crosby's § 440 motion to vacate his conviction on the basis that without Garner's testimony, there was no evidence of Crosby's involvement in the kidnapping. Crosby had by that time served more than 10 years of his sentence for the conviction.

his trial. The district court found that the state court's denial of Ortega's § 440 motion was erroneously predicated on Narvaez's recantation rather than on Garner's trial testimony and the credibility of Garner's recantation. The district court concluded that a hearing was necessary to determine whether Garner's recantation was truthful. At the hearing, Garner again recanted his trial testimony and testified that he had not witnessed Diaz's murder. Garner stated that he was pressured by the police to testify against Ortega.

One of the detectives who interviewed Garner on June 27, 1990, also testified at the hearing and denied giving Garner any information about the Diaz shooting. The hearing record was supplemented with the interview of Garner's mother in which she denied being at the scene of the murder. It was also supplemented with an affidavit of Betances, in which he stated that he did not know who shot him or Diaz with the shotgun, but that the police had visited him two days after the shooting and told him that Garner had identified Ortega as the shooter. Although Betances was unable to pick Ortega out of a photo array, he nevertheless agreed to identify Ortega as the shooter at trial.

Based on the evidence presented at the hearing, the district court held that Ortega had failed to carry his burden of proving by a preponderance of the evidence that Garner was telling the truth when he said he did not witness Diaz's murder and that he lied at Ortega's trial. The district court found that Garner's recantation was unworthy of belief and that Garner's credibility was virtually nonexistent. The district court also rejected Ortega's claims of police and prosecutorial misconduct with respect to Garner's testimony. On the basis of those conclusions, the district court denied Ortega's petition for habeas relief and

for a certificate of appealabililty on September 20, 2001.

On May 16, 2002, our court granted Ortega a certificate of appealability on four issues: (1) whether there is precedent of the United States Supreme Court holding that the prosecution's presentation at trial of perjured testimony that it does not know is perjurious violates due process; (2) if there is no such precedent, whether relief under 28 U.S.C. § 2254 can be granted on such a claim in light of 28 U.S.C. § 2254(d)(1); (3) whether the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented, *see* 28 U.S.C. § 2254(d)(2); and (4) whether there are any material state court determinations of factual issues that are not entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).

## *DISCUSSION*

█ Our standard of review for a district court's denial of a habeas petition is *de novo*, with its factual findings reviewed for clear error. *See Ponnapula v. Spitzer,* 297 F.3d 172, 179 (2d Cir.2002). As the district court recognized, the state court in this case explicitly refused to make any factual finding with respect to Garner's credibility, making the usual question of the degree of deference to accord such a finding inapplicable here. *See Channer v. Brooks,* 320 F.3d 188, 195 (2d Cir.2003) (per curiam) ("[W]here a state court does not resolve a question of fact, no presumption of correctness can possibly attach with respect to that issue."). Our task is thus to determine whether the district court clearly erred when it found that Garner's recantation was false and his testimony at trial was true.

█ A factual finding "is clearly erroneous only if 'although there is evidence to support it, the reviewing court on the en-

tire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers, Ltd.,* 190 F.3d 64, 67–68 (2d Cir.1999) (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). When a district court's factual finding is based upon a credibility determination, we are mindful that "particularly strong deference" should be granted to the finding in light of the factfinder's unique ability to assess the witness. *United States v. Mendez,* 315 F.3d 132, 135 (2d Cir.2002).

In this case, the district court concluded that Garner had essentially no credibility, and was "a totally compliant witness, who can be led by a questioner virtually wherever the questioner wants him to go." Based on its observation of Garner's demeanor on the witness stand and on discrepancies amongst his several sworn recantations, the district court believed that Garner was "making it up as he goes along." The court thus found that Garner's recantation of the testimony he gave at Ortega's trial was unworthy of belief.

We agree with the district court as to Garner's current suggestibility and give deference to its evaluation of the credibility of his recantation. We are nevertheless left with the conviction that the district court erred when it relied upon its credibility analysis to reach the conclusion that because Garner's recantation was not believable, his testimony at Ortega's trial must have been truthful. It seems the district court conflated the central question—whether Garner perjured himself at trial—with the issue of Garner's present credibility by assuming that Ortega could not prove the falseness of Garner's testimony without first proving the truthfulness of his recantation. Because evaluating the truthfulness of Garner's trial testimony represents a sep-

arate and more comprehensive inquiry than simply evaluating his recantation, we find that the district court erred when it focused solely on the issue of the credibility of Garner's recantation.

■ It is our view that a determination that Garner's recantation was not credible is insufficient to establish that Garner's trial testimony was not perjured. While a recantation must be "looked upon with the utmost suspicion," *Sanders v. Sullivan,* 863 F.2d 218, 225 (2d Cir.1988) ("*Sanders I* ") (internal quotation marks and citations omitted), its lack of veracity cannot, in and of itself, establish whether testimony given at trial was in fact truthful. Rather, the court must weigh all the evidence of perjury before it, including but not limited to the recantation, before reaching this conclusion.

■ There are several factors that we believe provide significant evidence that Garner, a demonstrated perjurer, was "making it up" when he testified at Ortega's trial. First, the statements made by Garner's mother that it was unlikely that Garner would meet her at the subway at 4:15 a.m., and that she had never been at the Diaz murder scene undermine both Garner's purported reason for being on the street at that hour and the portion of his trial testimony involving his mother. Second, Betances's recantation and his admission that he could not identify Ortega as Diaz's shooter cast doubt on the version of the shooting that Garner testified to at trial. Although these factors were discussed by the district court in its order, they were not given sufficient weight.

Additionally, the district court stated without elaborating that it had considered the fact that Garner's recantation in the Blake case was true. We find Garner's recantations in the Blake and Crosby cases to be perhaps the strongest evidence of Garner's willingness to lie at Ortega's trial.

Notably, Garner lied about Blake's involvement in a double homicide during the *same* police interview in which he named Ortega as the shooter in the Diaz homicide; Garner then went on to perjure himself at Blake's trial one month after testifying at Ortega's trial. Garner's substantiated perjury against Blake, as well as the state court's vacatur of Crosby's conviction in light of Garner's recantation in that case, deserve full consideration in determining whether Garner testified truthfully about Ortega.

As the district court acknowledged, "it is regrettable that any conviction, let alone a murder conviction, rests even in part on [Garner's] testimony." We find that it was clear error for the district court to focus exclusively on the credibility of Garner's recantation and, in so doing, not to give proper weight to the other evidence of Garner's perjury at Ortega's trial. We therefore hold that the district court was mistaken in concluding that the trial testimony given by Garner was true.

■ Finding clear error in this case, however, does not establish Ortega's right to habeas relief. A claim "based on newly discovered evidence ha[s] never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins,* 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (citing *Townsend v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), for the proposition that evidence that could not have been presented in the state proceedings "must bear upon the constitutionality of the applicant's detention"). In order for habeas relief to issue, then, a due process violation must have occurred at Ortega's trial.

■ We have held that a showing of perjury at trial does not in itself establish a violation of due process warranting habeas relief. *Sanders I,* 863 F.2d at 222. Instead, when false testimony is provided by a government witness without the prosecution's knowledge,[3] due process is violated only "if the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" *United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991) (quoting *Sanders I,* 863 F.2d at 226) (alteration in *Wallach*); *see also United States v. Gallego,* 191 F.3d 156, 162 (2d Cir.1999).[4]

■ Here, Garner's purported eyewitness testimony of the Diaz murder and his identification of Ortega as the shooter was

---

3. Ortega does not argue on appeal, as he did below, that the police suborned Garner's perjury and that the prosecution had knowledge of the perjury at trial. At most, he claims that the prosecution "should have known" of Garner's perjury and that its inadvertent introduction of his testimony violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Because we do not need to pass on the merits of Ortega's *Brady* argument in order to decide this appeal, and because such an argument does not appear to fall within the certificate of appealability issued to Ortega, we treat this case as one in which there was no prosecutorial knowledge of the perjury.

4. Although *Wallach* involved a direct appeal from a federal district court conviction, rather than a collateral attack on a state conviction through habeas, we find its reasoning applicable here. *Wallach* and other direct appeal cases (such as *Gallego*) required us to consider "the impact of witness perjury in the first instance" rather than examining a state court determination of the issue under the deferential standard set forth in 28 U.S.C. § 2254(d) (2002). *Channer,* 320 F.3d at 196. Because the state court never adjudicated the issue of Garner's perjury and the district court reached the erroneous conclusion that Garner did not perjure himself, we are in the position in this appeal to consider the impact of Garner's perjury for the first time.

clearly material to Ortega's conviction. We must therefore assess the likelihood that, without Garner's testimony, Ortega would not have been convicted of Diaz's murder. In so doing, we "decide whether the jury probably would have altered its verdict if it had had the opportunity to appraise the impact of the newly-discovered evidence not only upon the factual elements of the government's case but also upon the credibility of the government's witness." *United States v. Stofsky*, 527 F.2d 237, 246 (2d Cir.1975). We also consider "whether there was a significant chance that this added item, developed by skilled counsel ... could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir.1975) (internal quotation marks and citations omitted).

It is our view that Garner's testimony was essential to the government's case against Ortega. The only other evidence linking Ortega to the Diaz murder was the eyewitness testimony provided by the surviving victims, Betances and Narvaez. Betances identified Ortega as the shooter—testimony which he has subsequently recanted—and Narvaez testified that Ortega was not the shooter. Narvaez also testified that he did not see Garner at the scene of the murder. Set against the contradictory testimony of the two victims, Garner's testimony had the probable impact of swinging the balance against Ortega and undermining the veracity of Narvaez. Based on Garner's assumed credibility, the jury likely relied on his testimony in answering the difficult question of which victim to believe. Additionally, as an alleged uninvolved bystander whose observation of events was not clouded by fear, injury, and flight, Garner's testimony may have made an even greater impression with the jury than the testimony of the victims. Finally, Betances's recantation indicates that he agreed to identify Ortega as the shooter only because Garner had already done so, making the impact of Garner's false testimony even greater.

In light of these circumstances, we are persuaded that the jury in Ortega's trial would have been sufficiently affected by the newly-discovered evidence of Garner's perjury as to have reasonable doubt that Ortega committed Diaz's murder. We are therefore left with the firm belief that but for Garner's trial testimony, it is unlikely that the jury would have convicted Ortega. *See Wallach*, 935 F.2d at 459.

"Few rules are more central to an accurate determination of innocence or guilt than the requirement ... that one should not be convicted on false testimony." *Sanders v. Sullivan*, 900 F.2d 601, 607 (2d Cir.1990) ("*Sanders II*") (internal quotation marks and citations omitted). We hold as a matter of law that Ortega's conviction is in violation of his due process rights because without Garner's testimony, the jury would probably not have found Ortega guilty. We therefore grant Ortega's petition for habeas corpus.

## CONCLUSION

In accordance with the foregoing, we reverse the denial of Ortega's petition of habeas corpus and remand to the district court with instructions to vacate Ortega's conviction and order his release unless the state promptly affords him a new trial.