******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# CARLTON MARTIN *v.* COMMISSIONER OF CORRECTION
## (AC 39202)

Alvord, Sheldon and Bishop, Js.

*Syllabus*

The petitioner, who had been convicted of, inter alia, the crime of felony murder in connection with the shooting death of the victim, filed a second petition for a writ of habeas corpus, claiming, inter alia, that he was denied his due process rights under the federal and state constitutions because his conviction was obtained based on evidence of comparative bullet lead analysis, a forensic technique used by the Federal Bureau of Investigation (FBI) that, at the time of the petitioner's criminal trial, was widely accepted and routinely admitted by courts but was subsequently discredited. At the petitioner's criminal trial, an FBI agent, L, testified that her examination of bullets, using the lead analysis, showed that the bullets recovered from the victim's body and the crime scene came from the same box of bullets seized from the petitioner's bedroom. The petitioner argued that the introduction of essential evidence that later turned out to be false or scientifically invalid deprived him of his due process rights and entitled him to a new trial without the taint of false evidence. He also claimed that he received ineffective assistance from D, the counsel who had represented him with respect to his first habeas petition, because D failed, inter alia, to properly challenge L's testimony as to her examination of bullets using lead analysis. The habeas court rendered judgment denying the habeas petition, concluding, inter alia, that no violation occurred on the basis that the petitioner had presented no evidence that the state actors were aware of defects in lead analysis evidence at the time of the petitioner's criminal trial and that the petitioner had failed to show that the lead analysis evidence prejudiced his case. The habeas court, thereafter, granted the petition for certification to appeal, and the petitioner appealed to this court. *Held:*

1. The habeas court properly concluded that the petitioner was not deprived of his constitutional due process right to a fair trial by the admission of L's testimony regarding the lead analysis evidence, as this court was not left with the belief that but for L's testimony, the petitioner most likely would not have been convicted; the more significant forensic evidence was the testimony that the pistol that the petitioner had given to a witness to conceal was the same one used to shoot the victim, and that the ammunition seized from the petitioner's bedroom closet was of the same type and had the same coating as the bullets recovered from the crime scene, and because that evidence was unaffected by and unrelated to L's testimony regarding lead analysis, it was very unlikely that the jury's determination of guilt would have been different had L's testimony not been presented to the jury.

2. The habeas court properly rejected the petitioner's claim that D provided ineffective assistance in handling the claim that the lead analysis evidence lacked scientific validity; this court having concluded that there was no reasonable probability that but for L's testimony, the petitioner would not have been convicted, the petitioner could not prove that he was prejudiced by D's performance, especially given the overwhelming evidence of the petitioner's guilt, much of which was unaffected by and unrelated to L's testimony, and the petitioner also failed to demonstrate deficient performance by D, as the petitioner presented no basis from which this court could conclude that his trial counsel's conduct fell outside the wide range of reasonable professional assistance, and, therefore, the habeas court properly concluded that because the petitioner failed to establish that his trial counsel rendered ineffective assistance in failing to challenge the then-uncontroverted lead analysis evidence, D could not have been deficient in failing to raise that meritless claim.

Argued October 23, 2017—officially released February 13, 2018

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Sferrazza, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Darcy McGraw*, for the appellant (petitioner).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, and *Tamara Grosso*, assistant state's attorney, for the appellee (respondent).

*Opinion*

ALVORD, J. The petitioner, Carlton Martin, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, he claims that the court erred in: (1) rejecting his claim that his due process right to a fair trial under the state and federal constitutions was violated by the introduction of testimony from an agent with the Federal Bureau of Investigation (FBI) at his underlying criminal trial, which was later determined to be scientifically invalid; and (2) concluding that his habeas counsel did not render ineffective assistance of counsel. We affirm the judgment of the habeas court.

The following facts and procedural history are relevant to our resolution of the petitioner's appeal. In 2000, following a jury trial during which the petitioner was represented by Attorney Robert Field, the petitioner was convicted of felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), and five counts of tampering with a witness in violation of General Statutes § 53a-151. The petitioner was sentenced to a total effective sentence of ninety years imprisonment.

The petitioner appealed from the judgment of conviction, and this court set forth the facts underlying his conviction. "At 6 a.m., on January 18, 1999, the [petitioner] called Nicole Harris and asked her to drive from Bridgeport to Danbury to pick up his cousin, Tommie L. Martin. At approximately 8:30 a.m., Harris and the [petitioner] picked up Tommie Martin in Danbury. Harris then drove Tommie Martin and the [petitioner] to a gasoline station located next to Gallo's Hi-Way Package Store (Gallo's) in Danbury. After filling Harris' brown Chevrolet Chevette with gas, Harris drove along the street, passing Gallo's, and turned onto the street next to Gallo's, where she parked. The [petitioner] and Tommie Martin left Harris' vehicle and went toward Gallo's. After five minutes, the [petitioner] and Tommie Martin returned to the vehicle and Tommie Martin told Harris to drive around the block. When the vehicle was in front of Gallo's, Tommie Martin told Harris to drive by slowly. As Tommie Martin peered into Gallo's, he said, '[h]e's by himself,' and the [petitioner] responded, 'I have my heat on me, we'll go back in.' Tommie Martin told Harris to turn her vehicle around and park next to Gallo's. The [petitioner] and Tommie Martin left the vehicle and returned ten minutes later with bottles of E & J brandy. When they reentered the vehicle, Tommie Martin told Harris to drive onto the highway. While driving toward Bridgeport, the [petitioner] and Tommie Martin talked excitedly and were asking each other, '[W]as it worth it?' Shortly thereafter, police were called to the liquor store, where they found the victim, Robert Gallo, lying motionless, having been shot multiple times. The cash register had been disturbed, and two

bottles of E & J brandy were missing. Gallo died as a result of his injuries. The [petitioner] subsequently told Harris that he and Tommie Martin were involved in the robbery and shooting at Gallo's." *State* v. *Martin*, 77 Conn. App. 778, 781, 825 A.2d 835, cert. denied, 266 Conn. 906, 832 A.2d 73 (2003).

"On January 20, 1999, the [petitioner] called Harris and told her to come to his apartment to pick up something. When she arrived, the [petitioner] handed Harris a shoebox containing a .25 caliber handgun wrapped in a towel." Id., 781–82. "On January 25, 1999, the Danbury police department obtained a search warrant for the [petitioner's] and Tommie Martin's residence at 2108 Seaview Avenue in Bridgeport. The police executed the warrant. The police seized a sawed-off shotgun, a box of .25 caliber ammunition, a .22 caliber firearm and a magazine for a .22 caliber firearm." Id., 782. "While awaiting trial, the [petitioner] attempted to contact Harris from prison and did contact associates of Harris to urge her not to cooperate with the state and to dispose of the .25 caliber handgun, which she had been hiding." Id. "In March, 1999, Harris turned the gun over to the police, and ballistics tests confirmed that it had been used to fire the bullets that killed Gallo."[1] Id.

Attorney James Streeto represented the petitioner with respect to his appeal. This court affirmed the petitioner's conviction, rejecting arguments that the trial court improperly "(1) failed to recuse itself, (2) denied his motion to suppress certain letters and telephone call tapes, (3) refused to give a requested jury instruction on specific intent, (4) charged the jury as to consciousness of guilt, (5) denied his motion to suppress evidence pursuant to *Franks* v. *Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), and (6) denied him his constitutional right to present a defense as a result of certain evidentiary rulings."[2] Id., 780, 818.

In 2006, the petitioner, represented by Attorney Sebastian DeSantis, filed his first petition for a writ of habeas corpus (first habeas petition). In his amended petition, dated August 31, 2009, the petitioner alleged that (1) he was denied the effective assistance of appellate counsel in violation of the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution, (2) his conviction should be vacated because of newly discovered evidence disclosed by the FBI to the State's Attorney, and (3) he was prejudiced by the late disclosure of *Brady* material. The first habeas petition was tried before the court, *T. Santos, J.*, which issued a memorandum of decision on November 16, 2011, denying the petition. With respect to the claim of newly discovered evidence, the habeas court found such claim "indistinguishable, especially in light of the petitioner's assertion that this evidence is clear and convincing and would have proven that he is not guilty, from an actual inno-

cence claim." *Martin* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-06-4001122-T (November 16, 2011). The court found that the evidence produced in support of the claim, consisting of two letters from the FBI regarding the comparative bullet lead analysis used in the petitioner's case, fell short of the actual innocence standard. Following the granting of certification to appeal, the petitioner appealed, and this court affirmed the judgment of the habeas court by memorandum decision issued March 5, 2013. *Martin* v. *Commissioner of Correction*, 141 Conn. App. 903, 60 A.3d 412 (2013).

In August, 2013, the petitioner filed a second petition for a writ of habeas corpus, the petition at issue in this appeal. In his second amended petition, he alleged: (1) a violation of his constitutional rights to due process under the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution on the basis that his conviction was obtained using evidence of comparative bullet lead analysis that was subsequently discredited by the FBI and that there existed a "reasonable probability that but for [such] evidence . . . the petitioner would not have been convicted"; and (2) ineffective assistance of Attorney DeSantis, who represented the petitioner with respect to his first habeas petition. Specifically, the petitioner claimed that Attorney DeSantis was ineffective in failing to (1) challenge the testimony concerning comparative bullet lead analysis from FBI Agent Kathleen Lundy, (2) consult with a metallurgist to challenge the testimony of Lundy, (3) present forensic evidence with respect to the petitioner's seized clothing, and (4) present testimony of a crime reconstruction expert. The petitioner also claimed that Attorney DeSantis was ineffective in failing to consult with and present the testimony of an expert regarding comparative bullet lead analysis evidence. The second habeas petition was tried before the habeas court, *Sferrazza*, *J.*, which heard testimony from the petitioner, Attorney DeSantis, and William Tobin, a forensic metallurgist material scientist.

In its memorandum of decision, the habeas court described Lundy's testimony during the petitioner's criminal trial. Lundy testified as to her examination of bullets recovered from the victim's body and the crime scene, and bullets from cartridges in the ammunition box seized from the petitioner's bedroom closet using a technique known as comparative bullet lead analysis (CBLA). Lundy's testimony purportedly showed that the bullets retrieved from the victim's body and the crime scene came from the same box of ammunition seized from the petitioner's bedroom closet. The FBI previously had used CBLA to deduce whether a lead bullet came from a particular cartridge box from 1996 until it discontinued such examinations on September 1, 2005, after an independent research committee of

experts concluded that chemical comparison of trace elements found within bullets through CBLA did not produce sufficiently distinct outcomes to enable an analyst to conclude that bullets with the same chemical profiles come from the same box.

The habeas court rejected the petitioner's claim that the admission of CBLA evidence violated his due process rights, concluding that no violation occurred on the basis that the petitioner had presented no evidence that the state actors were aware of defects in CBLA evidence at the time of the petitioner's criminal trial. The court further concluded that the petitioner had failed to show that the CBLA evidence prejudiced his case, explaining that the more salient forensic evidence was the showing that the pistol the petitioner had given to Harris, which Harris had turned over to the police, was the pistol used to shoot the victim.

With respect to the petitioner's ineffective assistance of habeas counsel claim, the habeas court found that because the petitioner's trial counsel, Attorney Fields, could not have been deficient in failing to challenge the then-uncontroverted CBLA evidence, Attorney DeSantis could not be faulted for failing to claim ineffective assistance by Attorney Fields in the petitioner's first habeas trial. The court denied the petition and granted certification to appeal. This appeal followed.

"Initially, we set forth the appropriate standard of review for a challenge to the denial of a petition for a writ of habeas corpus when certification to appeal is granted. The conclusions reached by the trial court in its decision to dismiss [a] habeas petition are matters of law, subject to plenary review. . . . [When] the legal conclusions of the court are challenged, [the reviewing court] must determine whether they are legally and logically correct . . . and whether they find support in the facts that appear in the record. . . . To the extent that factual findings are challenged, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous." (Citation omitted; internal quotation marks omitted.) *Harris* v. *Commissioner of Correction*, 126 Conn. App. 453, 456–57, 11 A.3d 730, cert. denied, 300 Conn. 932, 17 A.3d 69 (2011).

I

The petitioner first claims that the habeas court erred in rejecting his claim that his due process right to a fair trial under the state and federal constitutions was violated by the introduction of false evidence, consisting of Lundy's testimony regarding CBLA.[3] He claims that "his right [to] a fair trial was violated because, due to the admission of flawed 'forensic' evidence by an incredible witness who was cloaked with the designation 'expert,' the adversarial system failed and he is therefore entitled to a new trial without the taint of false evidence." We disagree.

We first note that the petitioner does not claim that Lundy committed perjury. Moreover, in contrast to many of the cases relied on by the petitioner, the petitioner in the present case does not claim that the prosecution knew or should have known of flaws in Lundy's scientific testimony at the time of the petitioner's criminal trial.[4] In fact, he recognizes that "all parts of the system—prosecutor, defense counsel and the court—were under the false impression that the witness' testimony was true to a degree of scientific certainty . . . ." Instead, the petitioner claims that the introduction of "essential evidence" that "later turns out . . . [to be] false and/or scientifically invalid" deprives a criminal defendant of his due process rights "because the adversarial process fails."

As this court has recently acknowledged in *Toccaline* v. *Commissioner of Correction*, 177 Conn. App. 480, 492–93, 172 A.3d 821, cert. denied, 327 Conn. 986, A.3d (2017), neither our Supreme Court nor the United States Supreme Court has "addressed the question of whether the state's unknowing use of perjured testimony violates due process principles." (Internal quotation marks omitted.) See also *Westberry* v. *Commissioner of Correction*, 169 Conn. App. 721, 735, 152 A.3d 87 (2016) ("[i]t remains an open question in Connecticut whether the state's *unknowing* use of perjured testimony at trial can violate due process" [emphasis in original]), cert. denied, 324 Conn. 914, 153 A.3d 1289 (2017). In *Horn* v. *Commissioner of Correction*, 321 Conn. 767, 801–802, 138 A.3d 908 (2016), our Supreme Court expressly declined to decide that question, instead concluding that the petitioner had not established that the witnesses had committed perjury, and even without the witnesses' testimony, there was no reasonable probability that the petitioner would not have been convicted. Accordingly, the petitioner had not been deprived of his constitutional due process right to a fair trial. Id., 802.

Our Supreme Court has noted that a "majority of the federal circuit courts require a knowing use of perjured testimony by the prosecution to find a violation of due process." (Internal quotation marks omitted.) Id., 801; see also *Toccaline*, supra, 177 Conn. App. 492–93 n.12 (noting that "[t]he clear majority of jurisdictions require that a petitioner must prove that the prosecutor *knew or should have known* that the testimony at issue was false in order to establish a due process violation" [emphasis in original]). In *Ortega* v. *Duncan*, 333 F.3d 102, 108 (2d Cir. 2003), however, the United States Court of Appeals for the Second Circuit held that "when false testimony is provided by a government witness without the prosecution's knowledge, due process is violated only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." (Footnote omitted; internal quotation marks omitted.)[5]

This court, in *Toccaline*, supra, 177 Conn. App. 491–92, rejected the petitioner's claim that his due process rights were violated when the prosecutor unknowingly presented the false testimony of the victim and her family members. In rejecting the petitioner's claim, the court recognized that "there is no Connecticut case that supports the proposition that the petitioner's due process rights could have been violated by the prosecutor's presentation of false testimony when the prosecutor neither knew nor should have known that the testimony was false . . . ." Id., 493.[6] The court went on to conclude that "even under the more lenient approach taken by the Second Circuit in *Ortega*, [the petitioner's] claim would still fail." Id. As in *Toccaline*, even if this court were to apply the *Ortega* standard, the petitioner cannot prevail on his due process claim because "there is no reasonable probability" that but for Lundy's testimony, "the petitioner would not have been convicted."[7] See *Horn* v. *Commissioner of Correction*, supra, 321 Conn. 801 (declining to decide whether to adopt *Ortega* standard and instead concluding that petitioner could not prevail under that standard).

In its memorandum of decision, the habeas court detailed the evidence presented at the petitioner's criminal trial, in addition to Lundy's testimony, supporting his conviction. Evidence was presented that an individual named Eugene Laurel, or "Banana," sold a stolen, .25 caliber Titan pistol to the petitioner and his cousin. The petitioner was identified as having participated in the purchase of the gun and as having had access to the gun after they bought it. Together with the pistol, Banana gave the men an ammunition box partially filled with .25 caliber Winchester cartridges. Police later searched the apartment where the petitioner lived and seized an ammunition box with .25 caliber Winchester cartridges from the petitioner's bedroom closet.

The jury also heard the testimony of Nicole Harris, the owner and driver of the vehicle used during the robbery, who testified that the petitioner made statements showing his intent to rob the store and indicated that he had a gun. She testified that after the robbery, the petitioner admitted to shooting the victim. Harris further testified that a few days after the shooting, the petitioner gave her a shoe box containing the .25 caliber pistol and asked her to conceal it for him.[8] Harris later turned the pistol over to the police.

James Stephenson, a criminalist with the Connecticut State Department of Public Safety's Division of Forensic Services Forensic Science Laboratory, testified during the petitioner's criminal trial that the cartridges in the ammunition box seized from the petitioner's bedroom closet matched those used to commit the murder with respect to the caliber, type, manufacturer, and coating. Stephenson further testified that the cartridge casings recovered from the crime scene were fired from the

.25 caliber pistol turned over by Harris. The petitioner admitted calling his girlfriend from prison and, referring to the .25 caliber Titan as "dirty dishes," asking her to tell Harris to get rid of the gun. See *State* v. *Martin*, supra, 77 Conn. App. 817. The petitioner also engaged in multiple acts of witness tampering, which the habeas court found to show a strong consciousness of guilt.

Lundy, then an FBI agent specializing in CBLA, testified as to her opinion based on her examination of the bullets. She testified that the bullets recovered from the crime scene and the victim's body came from the same manufacturing lot as those bullets found in the ammunition box in the petitioner's bedroom closet.[9] Lundy's testimony, the habeas court concluded, was "minimally corroborative of the testimony of Banana, the petitioner's cousin, and Harris as to the petitioner's possession of the weapon and ammunition used in the shooting."

We agree with the habeas court's conclusion that the more significant forensic evidence was the testimony of Stephenson, who opined that the pistol the petitioner had given to Harris, which Harris turned over to police, was the same one used to shoot the victim. Stephenson further testified that the ammunition seized from the petitioner's bedroom closet was of the same type and had the same coating as the bullets recovered from the crime scene. This evidence was unaffected by and unrelated to Lundy's testimony, and we agree with the habeas court that it is very unlikely that the jury's determination of guilt would have been different had Lundy's testimony regarding CBLA not been presented to the jury. Accordingly, under the *Ortega* standard, we are not left with a firm belief that but for Lundy's testimony, the petitioner would most likely not have been convicted, and, therefore, the petitioner was not deprived of his constitutional due process right to a fair trial.[10] See *Ortega* v. *Duncan*, supra, 333 F.3d 108.

II

The petitioner next claims that the habeas court erred in concluding that his habeas counsel, Attorney DeSantis, did not render ineffective assistance of counsel. The petitioner claims that Attorney DeSantis improperly handled the petitioner's claim that the CBLA evidence lacked scientific validity. Specifically, the petitioner claims that Attorney DeSantis failed to present the testimony of an expert with whom he had consulted, and "merely introduced a report from the FBI stating that it no longer used" CBLA evidence. Moreover, the petitioner claims that Attorney DeSantis incorrectly presented the CBLA evidence claim as a claim of actual innocence, then "failed to introduce any evidence sufficient to establish affirmatively that the petitioner was actually innocent of that crime." We disagree that Attorney DeSantis rendered ineffective assistance of counsel.

"The use of a habeas petition to raise an ineffective assistance of habeas counsel claim . . . was approved by our Supreme Court in *Lozada* v. *Warden*, 223 Conn. 834, 613 A.2d 818 (1992). In *Lozada*, the court determined that the statutory right to habeas counsel for indigent petitioners provided in General Statutes § 51-296 (a) includes an implied requirement that such counsel be effective, and it held that the appropriate vehicle to challenge the effectiveness of habeas counsel is through a habeas petition. . . . [T]he court explained that [t]o succeed in his bid for a writ of habeas corpus, the petitioner must prove *both* (1) that his appointed habeas counsel was ineffective, and (2) that his trial counsel was ineffective. . . . As to each of those inquiries, the petitioner is required to satisfy the familiar two-pronged test set forth in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. First, the [petitioner] must show that counsel's performance was deficient. . . . Second, the [petitioner] must show that the deficient performance prejudiced the defense." (Emphasis in original; internal quotation marks omitted.) *Abreu* v. *Commissioner of Correction*, 172 Conn. App. 567, 574–75, 160 A.3d 1077, cert. denied, 326 Conn. 901, 162 A.3d 724 (2017).

"Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . In other words, a petitioner claiming ineffective assistance of habeas counsel on the basis of ineffective assistance of trial counsel must essentially satisfy *Strickland* twice." (Internal quotation marks omitted.) Id., 575. Our Supreme Court has characterized this burden as presenting a "herculean" task. *Lozada* v. *Warden*, supra, 223 Conn. 843; see also *Alterisi* v. *Commissioner of Correction*, 145 Conn. App. 218, 226–27, 77 A.3d 748, cert. denied, 310 Conn. 933, 78 A.3d 859 (2013).

With respect to the prejudice prong of *Strickland*, it is not sufficient "to show that [counsel's] . . . errors had some conceivable effect on the outcome of the proceedings. . . . Rather, [t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Abreu* v. *Commissioner of Correction*, supra, 172 Conn. App. 579. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *State* v. *Dupigney*, 295 Conn. 50, 61, 988 A.2d 851 (2010).

On appeal, the petitioner challenges only Attorney DeSantis' treatment and presentation of his habeas claims related to the scientific invalidity of Lundy's testimony during his criminal trial. We have already concluded in part I of this opinion that there is no reasonable probability that but for Lundy's testimony,

the petitioner would not have been convicted. In light of this conclusion, the petitioner cannot prove prejudice under *Strickland*. Even if Attorney DeSantis had consulted with and presented to the habeas court the testimony of both a metallurgist and an expert on CBLA evidence,[11] introduced additional exhibits beyond the FBI report, and presented the challenge to the CBLA evidence as a claimed due process violation rather than an actual innocence claim, the petitioner has failed to establish that there is a reasonable probability that the court in the first habeas proceeding would have found that the petitioner was entitled to a reversal of his judgment of conviction and a new trial. Given the overwhelming evidence of the petitioner's guilt, much of which was unaffected by and unrelated to Lundy's testimony, the petitioner cannot establish a reasonable probability that the first habeas court would have found the prejudice prong of *Strickland* satisfied. See *Crocker* v. *Commissioner of Correction*, 126 Conn. App. 110, 121, 10 A.3d 1079 (concluding that petitioner's ineffective assistance of habeas counsel claim failed because petitioner had not established prejudice, where challenged testimony during criminal trial was "far from the only evidence linking the petitioner to the murder" and where the "the state also introduced other significant evidence that was probative of the petitioner's guilt"), cert. denied, 300 Conn. 919, 14 A.3d 333 (2011).

While a reviewing court can find against a petitioner on either prong of *Strickland*; *Small* v. *Commissioner of Correction*, 286 Conn. 707, 713, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008); we also conclude, in agreement with the habeas court, that the petitioner has failed to satisfy the performance prong. The habeas court concluded that because the petitioner failed to establish that his trial counsel rendered ineffective assistance, habeas counsel could not have been deficient in failing to raise that meritless claim.

"In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . Judicial scrutiny of counsel's performance must be highly deferential and courts must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (Citations omitted; internal quotation marks omitted.) *Gerald W.* v. *Commissioner of Correction*, 169 Conn.

App. 456, 464, 150 A.3d 729 (2016), cert. denied, 324 Conn. 908, 152 A.3d 1246 (2017).

We conclude, as the habeas court did, that the United States Supreme Court's decision in *Maryland* v. *Kulbicki*,     U.S.     , 136 S. Ct. 2, 3, 193 L. Ed. 2d 1 (2015), is dispositive of the petitioner's claim. In that case, FBI agent Ernest Peele, the state's expert regarding CBLA, testified at the defendant's criminal trial in 1995 that "the composition of elements in the molten lead of a bullet fragment found in the [defendant's] truck matched the composition of lead in a bullet fragment removed from the victim's brain . . . ." Id. Peele further testified that a bullet from the defendant's gun was similar enough to the bullet fragments that "the two bullets likely came from the same package." Id. In 2006, by which time CBLA evidence was no longer generally accepted by the scientific community, the defendant raised a claim that his trial attorneys were ineffective in failing to question the legitimacy of the CBLA evidence. Id.

The Court of Appeals of Maryland agreed with the defendant, concluding that his trial counsel should have discovered a report coauthored by Peele that "presaged the flaws in CBLA evidence." Id. One of the findings in the report was that "the composition of lead in some bullets was the same as that of lead in other bullets packaged many months later in a separate box." Id. The Court of Appeals of Maryland concluded that this one finding should have led the report's authors to doubt the faulty assumption that bullets produced from different sources of lead have unique chemical compositions. Id. The United States Supreme Court reversed, concluding that there was no reason to believe that a diligent search would have uncovered the report. Id., 4. Moreover, even if it had, the report's ultimate conclusion was that CBLA was a "valid investigative technique," and therefore, it was questionable whether trial counsel would have brought it to the attention of the jury. Id.

In reversing, the United States Supreme Court also emphasized that the reasonableness of counsel's conduct must be judged as of the time of counsel's conduct. Id. In 1995, CBLA evidence was widely accepted and admitted, and courts routinely admitted CBLA evidence until 2003. Id. Accordingly, the court concluded that "[c]ounsel did not perform deficiently by dedicating their time and focus to elements of the defense that did not involve poking methodological holes in a then-uncontroversial mode of ballistics analysis." Id.

The petitioner in the present case was tried in 2000, within the time period in which CBLA evidence was regularly admitted.[12] The petitioner himself notes that the National Academy of Science did not disavow the methodology underlying CBLA evidence until 2007. Moreover, the CBLA evidence admitted at the petition-

er's trial is very similar to that considered by the United States Supreme Court in *Maryland* v. *Kulbicki*, supra, 136 S. Ct. 4. As in that case, the petitioner in the present case has provided no support for the conclusion that his trial counsel was "constitutionally required to predict the demise of CBLA." Id. The question is not "what counsel should have done to constitute the proper representation of the [petitioner] considering the case in retrospect, but rather, whether in the circumstances, as viewed at the time, the [petitioner] received effective assistance of counsel." (Internal quotation marks omitted.) *Lewis* v. *Commissioner of Correction*, 89 Conn. App. 850, 861–62, 877 A.2d 11, cert. denied, 275 Conn. 905, 882 A.2d 672 (2005); see also *Crocker* v. *Commissioner of Correction*, 101 Conn. App. 133, 136, 921 A.2d 128 ("[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time"), cert. denied, 283 Conn. 905, 927 A.2d 916 (2007).

The petitioner has presented this court with no basis from which we could conclude that his trial counsel's conduct fell outside the wide range of reasonable professional assistance. Accordingly, we agree with the habeas court that the petitioner failed to demonstrate that his trial counsel's performance was deficient and, therefore, his ineffective assistance of counsel claim against his habeas counsel also fails. See *Jefferson* v. *Commissioner of Correction*, 144 Conn. App. 767, 773, 73 A.3d 840 (where trial counsel was not ineffective, petitioner could not demonstrate that deficient performance of habeas counsel was prejudicial), cert. denied, 310 Conn. 929, 78 A.3d 856 (2013).

The petitioner has satisfied neither the performance prong nor the prejudice prong of the *Strickland* inquiry. Accordingly, the habeas court properly rejected the petitioner's ineffective assistance of habeas counsel claim.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] This court also set forth facts that reasonably could have been found by the jury from the evidence that the petitioner now claims violated his due process rights. This court stated: "Subsequent laboratory analysis of the bullets recovered from the victim's body and those in a box of .25 caliber cartridges found at the [petitioner's] apartment revealed their chemical elements to be indistinguishable. They all had come from that box of ammunition." *State* v. *Martin*, supra, 77 Conn. App. 782.

[2] In 2001, the petitioner filed a petition for a new trial on the basis of newly discovered evidence. See *Martin* v. *Flanagan*, 107 Conn. App. 544, 545, 945 A.2d 1024 (2008). Specifically, he claimed that a prison inmate, Terrell Stanton, had made statements to a third party exculpating the petitioner in the crimes for which he was convicted and incriminating himself. Id., 547–48. The trial court granted the state's motion in limine to preclude the admission of a former prison inmate's testimony recounting what Stanton told him. Id., 548. The court found such statements failed to satisfy the trustworthiness component necessary for the admission of third party statements against penal interest under the Connecticut Code of Evidence. Id.

The court further denied the petition for a new trial and granted certification to appeal. On appeal, this court affirmed the judgment of the trial court. Id.

[3] Although the petitioner argues that his due process rights under article first, § 8, of the Connecticut constitution were violated, he fails to provide an independent analysis under the state constitution. Therefore, we deem abandoned any state constitutional claim. *State* v. *Bennett*, 324 Conn. 744, 748 n.1, 155 A.3d 188 (2017).

[4] See, e.g., *Napue* v. *Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959) (expressing principle that "a state may not knowingly use false evidence, including false testimony, to obtain a tainted conviction" and holding that petitioner's due process rights were violated where witness lied in denying that he had been promised consideration for his testimony, and state's attorney knew that witness was lying); *Mooney* v. *Holohan*, 294 U.S. 103, 110, 55 S. Ct. 340, 79 L. Ed. 791 (1935) (briefly reciting due process principles in response to petitioner's claim that state's knowing use of "perjured testimony to obtain the conviction and the deliberate suppression of evidence to impeach that testimony constituted a denial of due process of law"); *Pyle* v. *Kansas*, 317 U.S. 213, 216, 63 S. Ct. 177, 87 L. Ed. 214 (1942) (petitioner "set forth allegations that his imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him"); *Giglio* v. *United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972) (addressing a *Brady* violation on basis of nondisclosure of promise made to witness in return for his cooperation).

[5] *Ortega* involved a claim of perjured testimony, and it is unclear whether *Ortega* requires a petitioner to show that the challenged testimony was in fact perjured or only that the testimony was false, as is claimed here. Because we conclude that the petitioner's due process claim fails even under the standard applied to perjured testimony in *Ortega*, we need not address this question. See *Toccaline*, supra, 177 Conn. App. 492 n.12 (noting uncertainty as to whether *Ortega* requires a petitioner to show that testimony was perjured or only that it was false, but concluding under *Ortega* standard that petitioner had not shown prejudice by admission of false testimony).

[6] The petitioner challenges the habeas court's reliance upon *Lewis* v. *Commissioner of Correction*, 116 Conn. App. 400, 411, 975 A.2d 740, cert. denied, 294 Conn. 908, 982 A.2d 1082 (2009), as support for its conclusion that in order to prevail on a due process claim involving false evidence, the petitioner would be required to prove that the prosecutor intentionally presented false evidence. The petitioner further claims that *Lewis* is "no longer good law in Connecticut." *Lewis* is distinguishable in that, there, the petitioner failed to present his perjury claim to the habeas court in the context of a claimed violation of due process and further failed to allege how the claimed perjury affected the outcome of his trial. Id., 412 n.9. We need not address the petitioner's claim that the court's reliance on *Lewis* was misplaced, given that this court's decision in *Toccaline*, which was released after the habeas court's decision in this case, is procedurally analogous to the petitioner's claim. *Toccaline*, rather than *Lewis*, guides this court's analysis.

[7] The petitioner provides no legal support for his contention that this court should review his claim to determine whether the introduction of the CBLA evidence was "harmless beyond a reasonable doubt." As the respondent argues, that standard is used to assess harm in the context of a direct appeal of a claimed constitutional violation and is inapplicable in the present habeas action. We agree, and accordingly, we reject the petitioner's request that this court engage in harmless error review.

[8] The petitioner claims that the jury "had before it the difficult task of determining who was telling the truth," given that Harris drove the getaway car and received immunity in exchange for her testimony. He claims that Lundy's testimony was especially harmful because it was the sole evidence tying the murder weapon to the petitioner, other than the remaining witnesses' self-serving testimony.

The jury was well aware of the fact that Harris had entered into an agreement pursuant to which she would not be prosecuted if she testified truthfully. She testified regarding the agreement on direct and cross-examination, and the written agreement was entered into evidence as a full exhibit and read to the jury during cross-examination. Whether a witness' testimony is believable is "a question solely for the jury. It is . . . the absolute right and responsibility of the jury to weigh conflicting evidence and to determine the credibility of the witnesses." (Internal quotation marks omitted.) See

*State* v. *Vazquez*, 119 Conn. App. 249, 255–56, 987 A.2d 1063 (2010) (where testimony of two witnesses for state differed in some respects, evidence that one witness' plea agreement hinged on his testifying against defendant, "merely provide[d] further information on which the jury made its credibility determinations").

[9] Lundy testified, in relevant part, as to her conclusions based on the examination she conducted of seven bullets and bullet fragments recovered from the crime scene and nine bullets from cartridges in the ammunition box:

"[The Prosecutor]: Based on your examination of the bullets, which you just described, what conclusions did you draw regarding the seven bullets and bullet fragments as compared to the nine bullets from the box?

"[The Witness]: When the analysis was completed, it was determined that the seven bullets, or bullet fragments, and the nine bullets from the cartridges in the box, were what we call, analytically indistinguishable in composition. And, basically, what that means is, if I were to hand you those seven bullets and the nine bullets from the cartridges, and ask you to sample them again, and then give me the samples blindly so that I didn't know which were from the fired bullets and which were the bullets from the cartridges, after I conducted the analysis, I still couldn't tell you. All the specimens were chemically the same.

"[The Prosecutor]: And what does that indicate to you about their time of manufacture and their place of manufacture?

"[The Witness]: Based on the results and my experience, the conclusion that I came to was that all those bullets were manufactured from the same source, or melt of lead. And because the live ammunition was a Winchester manufacture, that would have occurred at the Winchester manufacturing plant in East Alton, Illinois.

"[The Prosecutor]: And were those seven bullets and bullet fragments, and the nine bullets from the box, would they have been manufactured on or near the same time?

"[The Witness]: Yes, they would have.

"[The Prosecutor]: And would you expect other bullets manufactured on or about that same day from that same batch of lead to have the same analytically indistinguishable lead component?

"[The Witness]: Yes, I would. Based on experience, I would expect that other boxes of this same type—this .25 auto Winchester ammunition, it was loaded with the copper coated expanding point bullets. If I were to analyze other boxes made at the same time, I would expect to find the same composition."

[10] Because we resolve the petitioner's claim on the basis that he has not shown a reasonable probability that but for Lundy's testimony, he would not have been convicted, we decline to reach the petitioner's broader claims of error that "it is contrary to clearly established Connecticut law to assert that a petitioner is not permitted to raise a claim of due process violation in habeas corpus" and that a due process claim based on the unknowing presentation of false evidence need not be presented in the context of an actual innocence claim. Likewise, we need not address the respondent's arguments that the flaws in CBLA evidence are "not beyond the ken of the adversary process," that "parts of Lundy's testimony . . . were not entirely 'false,' and [that] not all courts have fully rejected CBLA testimony."

[11] In fact, as the habeas court found, Attorney DeSantis had consulted with a metallurgist, but declined to call him as a witness and elected to rely on the FBI report containing similar information.

[12] We note that Lundy's testimony did not go entirely unchallenged. On cross-examination, the petitioner's counsel elicited from Lundy recognition that if a local gun store ordered twenty-five boxes of the same product manufactured at the same time, the "boxes could have the same compositions in them." Lundy also acknowledged that she could not give a figure as to how many bullets produced from one melt of lead would have different compositions.